PLANNED CREDIT OF PUERTO RICO, INC., demandante y recurrida, *v.* CLYDE PAGE, demandado y recurrente.

*Número:* R-66-224 *Resuelto:* 16 de enero de 1975

*P. J. Santiago Lavandero,* abogado del recurrente; *Luis A. Lugo, Jr.,* abogado de la recurrida.

El Juez Asociado Señor Negrón García emitió la opinión del Tribunal.

El presente recurso impugna la sentencia dictada por el Tribunal Superior contra Clyde Page por la suma de $9,210.86 más costas, a favor de la recurrida Planned Credit of P.R., Inc., en adelante denominada *Planned.* (1) Los hechos pertinentes probados ante el tribunal de instancia, se pueden condensar del siguiente modo:

Para el verano de 1959 Pedro Bolívar, dueño de una fábrica de ventanas de aluminio haciendo negocios con el nombre de North & South American Products Co., tenía serias dificultades en el orden financiero e hizo contacto con los representantes de Brite of Puerto Rico, Inc., quienes previo estudio al efecto, acordaron prestarle ayuda económica hasta la suma de $25,000.00 bajo los términos y condiciones con-

___

(1) La prueba demostró que Planned era la sucesora de Brite of P.R., Inc., a la luz del Certificado de Consolidación presentado en el Departamento de Estado el 22 de mayo de 1961. A los efectos de una mejor exposición, nos referiremos a *Brite* en todo momento que tratemos en nuestra exposición errores o fundamentos relacionados con las transacciones objeto del litigio.

signados posteriormente en unos contratos firmados el 31 de agosto y 21 de septiembre de 1959.

No teniendo confianza en las habilidades administrativas de Bolívar, los representantes de Brite exigieron la formación de una nueva corporación en la cual debería tener interés un hombre de experiencia en el campo de los negocios, quien tendría una participación destacada en la dirección de la nueva empresa. Para ello, Pedro Bolívar formó la corporación American Metal Industries, Inc., en adelante identificada como *American*, de la cual el demandado Clyde Page—hombre de negocios de vasta experiencia—después de numerosas conversaciones con los representantes de Brite, accedió a formar parte y figurar como Vice Presidente y Gerente General de Supervisión. Tanto Brite como Page concluyeron que la nueva corporación tendría éxito bajo su dirección, haciéndose constar en los contratos antes aludidos, que éste le dedicaría algún tiempo a la dirección de American y que afianzaría los negocios de American para beneficio de Brite.

En consideración a la extensión de crédito por Brite a American, el recurrente Page, en 5 de octubre de 1959, firmó una fianza garantizando a la primera las obligaciones presentes y futuras de American hasta la suma de $15,000.00, en documento que transcrito literalmente reza del siguiente modo:

### "GUARANTY

In consideration of the extension by Brite of Puerto Rico, Inc. of its credit and financing services to the American Metal Industries, Inc., in which corporation the undersigned has an interest, I hereby *guarantee unconditionally all existing and future obligations* of the said American Metal Industries, Inc. to Brite of Puerto Rico, Inc. up to the sum of FIFTEEN THOUSAND DOLLARS ($15,000.00) and I hereby waive my right as surety to demand that said creditor, Brite of Puerto Rico, Inc., first seek to recover from American Metal Industries, Inc. before enforcing the terms of this guaranty.

This guaranty shall be in effect for 10 years.

IN WITNESS WHEREOF, I sign these presents, at San Juan, Puerto Rico, this 5th of October 1959.
[firmado] Clyde Page"

American constituyó además una hipoteca de bienes muebles sobre su equipo industrial a favor de Brite y se fijó un salario a Page o su representante de $100.00 semanales a ser aumentado posteriormente a $150.00, y una tercera parte de las acciones de la nueva empresa.

Brite of Puerto Rico, Inc., hizo adelantos de dinero a American Metal Industries, Inc. y pagó deudas de Products Co. que habían sido asumidas por American. No obstante, los negocios de American continuaron declinando, al extremo de que Brite ejecutó la hipoteca de bienes muebles y luego vendió el equipo obteniendo, entre unas cosas y otras, la suma de $15,000.00.

A esta fecha, el recurso ha quedado sometido con los señalamientos de errores apuntados por el recurrente en su petición original y argumentados en un breve memorando de autoridades al respecto. La demandante recurrida no ha radicado alegato alguno.

Para facilitar la exposición de esta opinión, procederemos a discutir de manera individual aquellos errores que no están entrelazados, analizando conjuntamente los que presentan características comunes o parten de una misma premisa.

■ El primer error, sin elaboración propia ulterior, alega que la sentencia es contraria a la prueba que tuvo el tribunal ante sí y al derecho aplicable. Hemos examinado minuciosamente la extensa transcripción de evidencia y la prueba documental, y salvo lo más adelante expuesto, este error no fue cometido y no amerita análisis excepto reiterar la norma de que ordinariamente, en nuestra función apelativa, no intervendremos con las apreciaciones y determinaciones de hecho del juzgador de instancia. *Rodríguez v. Concreto Mixto, Inc.*, 98 D.P.R. 579 (1970); *Rodríguez v. N. A. Co. of America*, 96 D.P.R. 874 (1969).

250

Los errores segundo, tercero, cuarto, quinto y sexto descansan sobre la misma premisa, a saber, que la demandante no tenía causa de acción ni capacidad para iniciar la demanda debido a que el dinero prestado a American era el producto de una sociedad entre Randolph Mattern y la antecesora de Planned (Brite).

Carecen de mérito estos errores, pues en el caso de autos no existió una sociedad sino una *empresa común*. La garantía en que se funda la causa de acción fue prestada por Page a Brite y no a ninguna otra persona natural o jurídica. Nada hay en ley, ni se nos ha señalado, que impida que una corporación participe en una *empresa común* (*joint venture*) con una persona natural, como la pactada entre el señor Mattern y Brite, y que consistió en que cada uno aportara en igual proporción el 50% de todos los dineros para el financiamiento de American con la intención expresa de dividirse las ganancias o sufrir igualmente las pérdidas. Se trata de una transacción usual en el comercio mediante el cual una parte aporta en una empresa dinero de inversión, y ello no significa necesariamente, como aduce el recurrente, de que advenga a la vida o exista una sociedad.

■ Aun cuando a veces resulta difícil distinguir entre una Sociedad y una Empresa Común (*Joint Venture*), el examen de las cartas (Exhibits 17 y 18 de la demandante) mediante la cual Brite y Mattern llegaron al acuerdo nos convencen, en adición a que tales documentos denominan el mismo como una *empresa común*, de que está presente la característica esencial que diferencia tal institución de una sociedad, a saber una operación limitada a una sola transacción. [2] El texto de la garantía abona a esta conclusión, pues

[2] Véanse: 2 Rowley, *On Partnership: Joint Adventures*, secs. 52.1–52.20, págs. 459–489 (1960) segunda edición; 2 Williston, *On Contracts*, secs. 318 A y 318 B, págs. 556–617 (1959) tercera edición; Empresa Mercantil en Comunidad, Puig Brutau, *Fundamentos de Derecho Civil*, Tomo III, Vol. II, pág. 23 *et seq.* (1973); Langle y Rubio, *Manual de Derecho Mercantil Español*, Tomo I, págs. 707–712 (1950).

fue constituida exclusivamente a favor de *Brite*.

No se trata de una asociación convenida para operaciones diversas y de naturaleza continua, sino una con un fin específico y restringido, que expresamente descartó el conferir interés en los negocios, ganancias, pérdidas u obligaciones del uno para con el otro, y en la cual Mattern delegó en fideicomiso a Brite todas las gestiones referentes a su participación.

■ La regla general adoptada por la mayoría de los tribunales en otras jurisdicciones es que de ordinario una corporación puede participar en una empresa común siempre y cuando ello esté dentro del ámbito de sus poderes corporativos. 60 A.L.R.2d: Anno: *Corporation in Firm or Joint Venture*, págs. 936-939.

El séptimo error apuntado señala que el tribunal de instancia debió paralizar los procedimientos judiciales en vista de que la corporación demandante estaba sometida voluntariamente a un procedimiento de reorganización bajo el capítulo 11 de la Ley de Quiebra Federal en la Corte de Distrito Sur de los Estados Unidos correspondiente a la Ciudad de Nueva York.

El error es frívolo. La prueba de la existencia de tal procedimiento constituye una orden del Juez de Quiebras que precisamente autorizaba a la demandante a continuar operando.

■ Se aduce como noveno error el no haber el tribunal impuesto todo el rigor de la ley en vista de los préstamos usurarios que evidenciaban los contratos que culminaron en la garantía de Page. La dificultad para que este señalamiento prospere estriba en que la parte demandante renunció expresamente al cobro de tales intereses al desistir de los $10,000.00 reclamados, lo que obviamente le relevó de las penalidades dispuestas en el Art. 1654 del Código Civil (31 L.P.R.A. sec. 4596), *Marrero* v. *Olmeda*, 69 D.P.R. 217 (1948).

En su décimo error el recurrente argumenta que el tribunal sentenciador debió haber suspendido los procedimientos y

oportunamente desestimado la demanda al no haber prestado la corporación demandante una fianza adicional de no residente requerida de $1,000.00, ello conforme lo dispuesto en la Regla 69.5 de las de Procedimiento Civil vigentes.

De los autos originales y de la transcripción de evidencia surge lo siguiente sobre el particular: La recurrida Planned prestó inicialmente la fianza exigida por el tribunal por la cantidad de $1,000.00, y a solicitud del demandado Page, en 7 de diciembre de 1965 el tribunal mediante orden en corte abierta aumentó la misma a $2,000.00 para ser presentada dos días después de haberse terminado la vista del caso. (T.E. de estenotipista Luisa Torres Martínez, págs. 25–27).

El proceso continuó los días 8, 9, 13, 15 y 16 de diciembre de 1965, finalizando el desfile de prueba el 24 de marzo de 1966. En dicho día se planteó nuevamente la cuestión del aumento de fianza y el tribunal—a una moción de reconsideración de la recurrida en el sentido de que no venía obligada a prestar fianza por razón de ser una corporación autorizada a realizar negocios en Puerto Rico—concedió tres días para sostener en memorando tal planteamiento o prestar la fianza, ello bajo apercibimiento de desestimación. (T.E. de estenotipista Laura E. Domínguez Cossío, págs. 59–61). El 29 de marzo de 1966 la demandante consignó en cheque certificado la suma adicional de $1,000.00 en cumplimiento de tal orden y reiteró su posición de que como corporación autorizada a realizar negocios en Puerto Rico no le aplicaba la Regla 69.5. El demandado Page se opuso y la recurrida Planned radicó Memorial argumentando su posición. Se celebró vista sobre este particular en 15 de abril de 1966, y según la minuta, la cuestión quedó sometida. El 25 de mayo de 1966 el tribunal a quo dictó la sentencia objeto del recurso sin hacer mención sobre el particular.

Estimamos que el silencio del tribunal de instancia en torno a este planteamiento en su sentencia declarando con lugar la demanda, implícitamente constituyó una determinación dene-

gando la desestimación solicitada. En las circunstancias específicas del caso concluimos que fue correcta tal actuación. Veamos.

Bajo el lenguaje de la Regla 69.5 ([3]) un tribunal no tiene facultad discrecional para eximir a un demandante no residente o a una corporación extranjera del requisito de fianza, y ordenada la misma, el procedimiento debe suspenderse hasta que sea prestada y en su defecto, una vez transcurridos 90 días, debe desestimarse la acción. La regla tampoco confiere autoridad para fijar el monto de dicha fianza en una suma menor a la de trescientos dólares ($300.00).

■ Dentro del significado de esta regla, la fianza es exigible a una corporación que no haya sido organizada bajo las leyes del Estado Libre Asociado de Puerto Rico, no siendo eximente el que como entidad extranjera esté autorizada a realizar negocios en Puerto Rico en virtud del trámite establecido en los Arts. 1401 a 1407 de la Ley de Corporaciones según enmendada (14 L.P.R.A. secs. 2401 a 2407). El que una corporación extranjera o foránea autorizada a realizar negocios en Puerto Rico mantenga oficinas o posea propiedades en nuestra jurisdicción—sobre las cuales pudiera hacerse efectivo el pago de honorarios o costas reconocidos a una parte demandada de no prevalecer la reclamación promovida por la entidad corporativa—es un factor que meramente afecta la determinación del monto de la fianza pero no su imposición. Concluir lo contrario sería inyectar a los términos mandatorios de la regla una flexibilidad no contemplada, originando

---

([3]) Dispone lo siguiente:

"Cuando el demandante residiere fuera de Puerto Rico o fuere una corporación extranjera, se le requerirá para que preste fianza para garantizar las costas, gastos y honorarios de abogado en que pudiere ser condenado. Todo procedimiento en el pleito se suspenderá hasta que se preste la fianza, que no será menor de trescientos dólares. El tribunal podrá ordenar que se preste fianza adicional si se demostrare que la fianza original no es garantía suficiente, y se suspenderán los procedimientos en el pleito hasta que hubiere prestado dicha fianza adicional."

controversias sobre la existencia de bienes en Puerto Rico que se pretendieron evitar mediante la adopción de un lenguaje claro y sencillo. ([4])

Ahora bien, la Regla 68.1 de las de Procedimiento Civil vigentes consagra la norma general de que en la computación de cualquier término concedido por orden de un tribunal, se excluye el primer día, y si el plazo es menor de siete (7) días, no se computan los sábados, domingos y días de fiesta.

■ Salvo que en una orden de un tribunal expresamente se provea que la norma general antes expuesta no es aplicable en la computación de determinado término—al amparo de la Regla 68.1 del mismo cuerpo que autoriza la prórroga o reducción de la mayoría de plazos fijados—resolvemos que la norma de exclusión del primer día, sábados, domingos y días de fiesta legal en períodos menores de siete días, favorece de ordinario a una parte.

Habiendo finalizado la vista en sus méritos del caso que nos ocupa el jueves 24 de marzo, la fianza prestada el martes 29 se radicó en tiempo.

■ Concedemos que el no haber el tribunal paralizado el proceso al dictar la orden aumentando la fianza original hasta que fuera prestada es un error; sin embargo, lo consideramos uno de naturaleza no perjudicial en vista de que oportunamente la misma fue presentada. *Capital Merchandise* v. *Gerardino & Co., et al.*, 31 D.P.R. 5 (1922).

El undécimo error apuntado está fundado en que el tribunal no debió concluir sin prueba que el señor Mattern delegó

---

([4]) En los Estados Unidos los tribunales estatales y federales han enfocado el problema dependiendo del carácter directivo u obligatorio expresado en la regla o estatuto correspondiente a fianzas de no residente. 84 A.L.R.: Anno: *Statutes Requiring Security for Costs*, págs. 252–265. Es interesante notar que en el estado de Nueva York la regla fue enmendada eximiendo de la prestación de tal fianza "a una corporación extranjera autorizada a hacer negocios en el estado." *Pittsburgh Plate Glass Co.* v. *Queen City Marina, Inc.*, 256 N.Y.S.2d 999 (1965).

en Brite la administración de la operación de financiamiento delegando el cobro de cualquier cantidad adeudada.

Nuevamente se parte del supuesto que el acuerdo del señor Mattern con la demandante Planned constituyó una sociedad, cuestión que hemos resuelto en contra del recurrente. El examen de la evidencia presentada y el análisis de los primeros errores derrotan este planteamiento.

Bajo los errores duodécimo, décimo tercero y décimo sexto, el recurrente Page elabora la teoría de que su actuación constituyó un mero favor (*accommodating party*) engañado e inducido a suscribir la fianza que motivó la sentencia; que el incumplimiento de Brite y la American le exime de tal responsabilidad; y que la demandante estaba impedida de instar acción ". . . a la luz de la promesa implícita héchale por la Planned Credit *en una carta a Page*, Exhibit [*sic*], en donde claramente le hacían ver que dicha demandante sólo le demandaría si no obtenía un *substantial amount* por la venta del equipo de la fábrica de American Metal Industries, Inc., lo cual admitió la demandante haber obtenido y así lo admitió Laidhold, desde la silla, y afirmó que la suma de $10,000 recibida por la venta del *equipo* era sin duda una *suma* sustancial."

Estos errores presuponen que dejemos sin efecto las determinaciones del tribunal de instancia, que a nuestro juicio tienen apoyo suficiente en la prueba. Descansan sobre el supuesto de que Page fue engañado a través de toda la transacción.

El análisis cuidadoso de toda la prueba testifical y documental derrotan tal teoría. El recurrente Page admitió haber firmado los contratos y la fianza y nada hay en la prueba que indique o sugiera una incapacidad para entender el alcance y significado de las obligaciones por él asumidas. El récord revela claramente que intervino en la transacción bajo la creencia de que no perdería dinero, pero ello no significa que su estado mental le impidiera realizar la posibilidad, aun

limitada, de que vendría obligado por la fianza prestada. Orientadora es la respuesta que produjo a una pregunta del Juez sentenciador:

"Juez Moreda: Your state of mind, if I understand you correctly, was that although by giving a guarantee to the obligations there was a chance that maybe would oblige you to pay but that chances was very limited? [*sic*]
Testigo: That is correct." (T.E. de estenotipista H. López McCormick, pág. 326.)

No podemos atribuirle al demandado una ingenuidad casi inexistente en el mundo de los negocios en que se desenvolvía, (5) en vista de la preponderante prueba indicativa de que era una persona con preparación académica de más de tres años de universidad, experiencia previa durante más de veinte años, que había sido factor decisivo en la organización de varios negocios. (T.E. de estenotipista H. López McCormick, págs. 300–303.)

Aplicable a tal posición y conducta es el siguiente lenguaje:

"No puede sostenerse con éxito que una persona de cabal juicio y completa capacidad, cuando suscribe un documento de declaración de deuda, no se detenga a ver el documento, y a saber lo que firma. Lo regular, lo humano, es que cualquier persona consciente, que va a firmar un documento de esa clase, lo vea, y se dé cuenta de cuáles son las posibles responsabilidades de su acto; . . . ." *P. Millón & Co., Sucrs.* v. *Caamaño,* 38 D.P.R. 193, 199 (1928).

El argumento de que firmó la garantía como un simple favor (*accommodating party*) para viabilizar el negocio, no milita en contra de sostener su responsabilidad como fiador, pues conocida es la regla de derecho imperante en nuestra jurisdicción, elaborada bajo nuestro Código Civil, que

---

(5) Es interesante notar cómo en su propio testimonio acepta, al narrar lo acontecido en una reunión para discutir una posible transacción, que era responsable hasta la suma de $15,000.00. (T.E. McCormick, pág. 260.)

obliga a un fiador a satisfacer una deuda, aun cuando no haya recibido beneficio alguno en la transacción. *Marrero* v. *Olmeda*, 69 D.P.R. 217, 223–224 (1948); *National City Bank* v. *Llonín*, 41 D.P.R. 163, 171 (1930); *Pérez* v. *Soc. Agr. Santiago Hnos.*, 37 D.P.R. 15, 18 (1927); *Crédito y Ahorro Ponceño* v. *Beiró*, 32 D.P.R. 817, 820 (1924); *Hernández* v. *Delgado*, 31 D.P.R. 570, 572 (1923); y *Cintrón & Aboy* v. *Solá*, 22 D.P.R. 262, 268 (1915).

El señalamiento de que Brite incumplió a Page y por lo tanto ello le releva de su obligación es improcedente pues las obligaciones sobre estos extremos contempladas y pactadas en los contratos, fueron asumidas por Pedro Bolívar, Jr. y la American. Brite, como entidad que aportaba el financiamiento, impuso varias condiciones para proteger sus intereses, y ello no implica que se estuviera obligando a cumplir obligaciones correspondientes a otras personas.

Hemos analizado la prueba documental en que el recurrente apoya la proposición de que Planned le relevó del pago de su obligación y concluimos que el señalamiento es totalmente frívolo. La carta en cuestión, fechada 7 de abril de 1961—que forma parte de más de quince (15) comunicaciones que le fueron cursadas poniéndolo en conocimiento de las gestiones de Brite para lograr un precio de venta satisfactorio sobre una maquinaria industrial adquirida de American mediante procedimiento de ejecución judicial—expresa lo siguiente:

"We have done everything possible to liquidate Bolivar's assets to bring in the greatest amount of money. We have been very patient and we have spent a lot of money in legal expenses, etc. to cooperate with all of the people concerned.

Unless the machinery and equipment which we now have purchased and own can be re-sold for a substantial amount of money, *it would appear that you will be required to make good the full $15,000. under your guaranty to make up part of the deficiency. I hereby formally demand the payment of said $15,000.*" (Énfasis suplido.)

Tampoco fueron cometidos los errores décimo cuarto y décimo quinto planteados, consistentes en que el tribunal de instancia debió aplicar la defensa de *confusión*, o en la alternativa, decretar inexistente la obligación surgida de la fianza debido a alegados incumplimientos contractuales de Brite. Irrespectivamente de que el tribunal sentenciador dirimió la prueba sobre este particular en contra del recurrente, aun bajo tales incumplimientos, las obligaciones que dan vida a los mismos corespondían a la entidad American y no a Brite. A tal efecto, el salario que le fue asignado a Page, la entrega de sus acciones y el salario de su asistente no eran compromisos de Brite según los contratos suscritos. Por igual razón era improcedente la contrademanda interpuesta por el recurrente contra la demandante en cobro de dinero pagado a su ayudante por servicios prestados a la American y por alegados daños y perjuicios.

Resta evaluar el octavo error que impugna la determinación del tribunal sentenciador de que la demandante recurrida Planned probó satisfactoriamente haber pagado la suma de $24,210.86 bajo el contrato de financiamiento.

El examen de los méritos de este señalamiento—que constituye un ataque frontal a las determinaciones basadas en la evidencia según dirimida por el tribunal de instancia—implica de inmediato, que descartemos por improcedente la argumentación y conclusión de cuantía que se hace respecto al dinero proveniente de Mattern, en virtud de la empresa común (*joint venture*) que existió. En nada afecta ni beneficia al recurrente el origen del financiamiento, por no ser ilícito, a la cuestión que nos ocupa, siendo determinante única y exclusivamente las cantidades que la demandante desembolsó realmente a American de conformidad con el contrato y si las mismas fueron debidamente probadas ante el tribunal.

■ Preciso es destacar que la garantía prestada por Page, por sus propios términos goza de la naturaleza de una fianza solidaria y en ella se obligó a satisfacer ". . . incondi-

cionalmente todas las obligaciones presentes y futuras de [...] American Metal Industries, Inc. a Brite de Puerto Rico, Inc. hasta la suma de quince mil dólares ...." (traducción nuestra.) Tal fianza, en sus relaciones con el acreedor, lo convirtió en un principal pagador desde el momento en que American dejó de cumplir lo convenido. *Drug Company of P.R., Inc.* v. *Susoni*, 43 D.P.R. 772, 781–782 (1932); *Sucrs. de Gamarra, S. en C.* v. *Navarro*, 40 D.P.R. 745, 750–751 (1930). Igualmente, es claro que la obligación de Page era sobre las obligaciones *existentes* y *futuras* de la American pero no en cuanto a ninguna otra persona natural o jurídica.

El principio de hermenéutica consagrado en el Art. 1726 (31 L.P.R.A. sec. 4876)—aplicado en el caso de *Pratts* v. *Corte*, 66 D.P.R. 5 (1946) y otras decisiones allí citadas— en el sentido de que las fianzas se interpretan restrictivamente, no ha perdido eficacia ni virtualidad por nuestra doctrina jurisprudencial(6) en contrario manifestada en casos de fianzas prestadas por compañías de seguros mediante el pago de primas, u otorgadas en la construcción de obras o para cumplir las exigencias de un estatuto. Esta doctrina tiene su razón de ser en el carácter oneroso y comercial de las compañías dedicadas al negocio de fianzas mediante el pago, o en el interés público de que está revestida la naturaleza del objeto que se intenta proteger en las obras de construcción o en las leyes especiales correspondientes.

Es evidente la distinción sustantiva y de finalidad que justifica el trato diferente de las fianzas de los casos previamente expuestos, en contraposición con aquellas en que el fiador actúa por mera liberalidad sin recibir directa o in-

---

(6) *Goss* v. *Structural Concrete Products*, 92 D.P.R. 391, 394 (1965); *Jiménez y Salellas, Inc.* v. *Maryland Cas. Co.*, 92 D.P.R. 207, 209–210 (1965); *Ulpiano Casal, Inc.* v. *Totty Mfg. Corp.*, 90 D.P.R. 739, 744–745 (1964); *A. L. Arsuaga, Inc.* v. *La Hood Const., Inc.*, 90 D.P.R. 104, 112-113 (1964).

directamente algún tipo de compensación razonablemente precisable.

Aplicado el principio antes consignado, la fianza prestada por Page a la American para garantizar los pagos de Brite debió ser objeto de interpretación restrictiva.

Hemos escudriñado minuciosamente la transcripción de las declaraciones de los testigos y examinado con detalle la evidencia documental presentada por ambas partes, con el objeto de evaluar los méritos del señalamiento que impugna la cuantía determinada por el tribunal a la luz de la fianza. El recurrente Page admite en su solicitud que la American recibió cheques a su nombre o que fueron pagados a nombre de dicha entidad por Brite por la suma total de $16,855.21. El no haber elaborado ni desglosado claramente cómo llegó a dicha cantidad, nos impide aceptar la misma.

Sobre el particular, la prueba indica que Page autorizó el recibo de cheques girados por Brite a favor de American, por un valor total de $10,728.70, [7] aceptando además como deudas pre-existentes cubiertas bajo los términos de su garantía, las cuentas relacionadas con el suministro de energía eléctrica, seguro social y lo que había pagado Brite a Armco. [8] Estas últimas suman $7,147.57, que unida a la cantidad previa de $10,728.70 nos arroja un saldo inicial de $17,875.27.

---

[7] T.E. López McCormick, págs. 286–288. Del análisis que hemos realizado concluimos que se relaciona con los siguientes cheques expedidos por Brite a favor de American:

| Número de Cheque | Fecha | Cantidad |
|---|---|---|
| 244 | 10-9-59 | $ 314.63 |
| 245 | 10-9-59 | 251.00 |
| 266 | 10-16-59 | 1,500.00 |
| 289 | 10-26-59 | 50.00 |
| 19 | 10-27-59 | 1,200.00 |
| 22 | 10-30-59 | 2,000.00 |
| 36 | 11-20-59 | 5,413.07 |
| | Total | $10,728.70 |

Aclarado este extremo, con excepción de los tres cheques antes relacionados, se impugnan los pagos efectuados a otras terceras personas y sus conceptos, al igual que todos los cheques expedidos por Brite directamente al señor Bolívar.

Tal impugnación básicamente descansa sobre uno de los siguientes fundamentos: forma en que fueron expedidos; ausencia de comprobante (*supporting document*) que en buena contabilidad los apoye; carácter personal (Bolívar) de los cheques no correspondientes a obligaciones de American; y el pago de obligaciones después de haber cerrado dicha entidad sus operaciones.

La parte demandante demostró fehacientemente, con documentos explicativos de desembolso, haber pagado servicios relacionados con American, la cantidad total de $1,877.50 por lo cual no procede dicho planteamiento en su totalidad.[9]

■ No menoscabamos la regla de respeto a las determinaciones de hecho de los tribunales de instancia cuando evaluamos prueba documental, pues sobre ésta ocupamos igual

---

[8] T.E., id, págs. 232–233. Estos cheques, expedidos directamente, son:

| Número de Cheque | Fecha | Cantidad |
|---|---|---|
| 156 | 9-2-59 | $ 360.00 |
| 13 | 9-8-59 | 6,366.07 |
| 165 | 9-9-59 | 421.50 |
| | Total | $7,147.57 |

[9] Son los que a continuación se relacionan:

| Número de Cheque | Fecha | Cantidad |
|---|---|---|
| 169 | 9-10-59 | $ 80.00 |
| 180 | 9-10-59 | 400.00 |
| 250 | 10-13-59 | 180.00 |
| 170 | 9-11-59 | 100.00 |
| 374 | 9-18-59 | 374.00 |
| 196 | 9-25-59 | 295.00 |
| 222 | 10-2-59 | 274.00 |
| 229 | 10-6-59 | 30.00 |
| | Total | $1,733.00 |

posición que la de los foros primarios,(¹⁰) máxime cuando surge que la prueba testifical de ambas partes básicamente se dirigió a explicar el contenido y alcance de la prueba documental producida según sus respectivas posiciones.

Nuestro análisis revela que le asiste al recurrente la razón en lo concerniente a los siguientes cheques: número 213 de 9-30-59 a nombre del señor Bolívar por la suma de $1,025.00, pues no obstante su fecha, la evidencia demuestra que fue un préstamo personal a éste realizado por David P. Sherman mucho antes de haberse suscrito el contrato del 31 de agosto de 1959 (T.E. de estenotipista Laura B. Domínguez, págs. 62–63); el número 215 de 9-30-59 por la suma de $1,916.79 por resultar también en pago de un préstamo personal del señor Bolívar existente en el Bco. Crédito y Ahorro Ponceño (T.E. de estenotipista McCormick, pág. 466.); y el número 168 de 9-10-59 por la suma de $448.94 expedido a nombre del Banco de Ponce. Independientemente de la parte demandante no haber producido el cheque de $2,000.00 pagado a ARMCO, el exhibit 6 de ésta demuestra que a la fecha del pago, 6 de agosto de 1959, el recurrente no había todavía suscrito ninguna obligación.

Tampoco son recobrables los honorarios pagados al Lic. Robert M. Sweeting—evidenciados en los cheques 7387, 16409 y 7282—ya que aun bajo el supuesto de que fueran en concepto de servicios prestados a Brite en la tramitación del caso contra la American—lo cual no se demostró—ello derrotaría *per se* cualquier base para sostener que se trataba de un gasto contraído por esta última comprendido en la garantía de Page. Es ilustrativo de que la demanda en el caso que nos ocupa está fechada 21 de julio de 1961 y los cheques a nombre

---

Se reconoce además el pago de $144.50 en concepto de un seguro sobre la maquinaria de American, lo que nos brinda un total de $1,877.50.

(¹⁰)*Miranda* v. *Editorial El Imparcial, Inc.*, 99 D.P.R. 601, 618 (1971); *Central Igualdad, Inc.* v. *Srio. de Hacienda*, 83 D.P.R. 45, 52 (1961) y casos en este último citados.

de dicho letrado son todos con posterioridad a 1ro. de agosto de 1961 y se extienden hasta el año 1962 cuando ya estaba judicialmente trabada la contienda que nos ocupa. Sus cantidades señalan que se trata de gastos incurridos en la tramitación de este pleito.

No puede sostenerse que el Lic. Sweeting estuviera prestando servicios legales a American durante el período en que como abogado de Planned había radicado una demanda en su contra. Tales gastos eran prematuros y hubiesen sólo sido recobrables con posterioridad contra Page, de haber el tribunal de instancia impuesto en su sentencia honorarios de abogado o haberse radicado y aprobado memorándum de costas al amparo de la Regla 44 de las de Procedimiento Civil vigentes, ninguna de las cuales aconteció.

■ Computadas las cantidades correctas surge que la demandante demostró haber satisfecho pagos correspondientes a American—directa o a través de terceras personas—por la cantidad de $19,752.77, de la cual procede restarse $15,000.00 previamente por ésta reconocidos, quedando un balance líquido y exigible únicamente de $4,752.77.

*Procede modificarse la sentencia a la suma de $4,752.77 y confirmarla así modificada.* En vista del largo tiempo transcurrido desde que se dictó la sentencia original y en consideración a las constancias en autos de que la demandante Planned Credit of P.R., Inc., estaba en un procedimiento de quiebra ante la Corte de Distrito Sur de los Estados Unidos correspondiente a la Ciudad de Nueva York, el importe de la sentencia deberá ser consignado en el tribunal de instancia sujeto su retiro a la acreditación y autorización correspondiente que garantice que la misma será entregada a la persona natural o jurídica a quien en derecho corresponda.