JUAN ANTONIO GARCÍA, ETC., demandantes y peticionarios, *v.* THE COMMONWEALTH INSURANCE CO., demandada; SAM P. WALLACE & CO., interventora y recurrida.

*Número:* CE-85-616 *Resuelto:* 5 de marzo de 1987

*Pablo Carrasquillo,* abogado del peticionario; *Teodoro Peña García,* de *Rodríguez-Ramón & Peña,* abogado de la recurrida.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

I

Sam P. Wallace & Co. (Wallace) demandó en cobro de dinero la suma de $1,216,108.02 a Abarca Warehouse Corp. (Abarca), por concepto de unas obras que ésta le encomendó en tres proyectos de construcción. Para garantizar la sentencia que en su día pudiera recaer a su favor, embargó preventivamente diversos bienes de Abarca valorados en $1,366,108.02. Abarca levantó dicho embargo, mediante dos fianzas montantes a la suma de $500,000 que obtuvo de la Commonwealth Insurance Co. (Commonwealth), quien mancomunada y solidariamente garantizó "el pago de la reclama-

ción . . . en el caso de que el demandante obtuviere sentencia definitiva y firme a su favor".

Abarca contestó la demanda. En síntesis alegó que no existía causa de acción porque la deuda no era líquida. Adujo que la demanda era prematura, pues no se habían realizado las auditorías finales ni precisado la cuantía adeudada. Reconvino reclamando la suma de $292,730.93 por concepto de cesión del contrato, beneficio neto y otros extremos.

Así las cosas, el 9 de enero de 1976, Wallace y Abarca transigieron el pleito. Abarca consintió que se dictara sentencia en su contra por la cantidad de $500,000. Esta suma sería pagadera en tres plazos evidenciados por sendos pagarés, emitidos el mismo día a nombre de Wallace o a su orden, exigibles el 31 de diciembre de cada año comenzando en 1976. Abarca renunció además a su reconvención contra Wallace y le cedió todos los derechos y obligaciones que tuviera respecto a los contratistas principales, Francisco Levy e Hijo, Inc. y Buttler Pan American Corp., quienes nunca fueron parte en el litigio. "[A]mbas partes se releva[ron] recíprocamente de cuantas *reclamaciones tuviera una contra la otra* como consecuencia de los *hechos* que se relata[ban] *en las alegaciones de este caso.*" (Énfasis suplido.) Aun así pactaron que la suma de $500,000, hasta su saldo total, estaría garantizada mancomunada y solidariamente por la Commonwealth en virtud de las fianzas que había expedido para levantar el embargo.

El acuerdo fue sometido al Tribunal Superior, Sala de San Juan. Éste, el 21 de enero de 1976, dictó sentencia. El 10 de mayo, Wallace solicitó y obtuvo del tribunal orden de que no se cancelaran las fianzas.

En ningún momento la afianzadora Commonwealth fue notificada, participó, intervino o consintió a esa transacción y sentencia.

Abarca sólo satisfizo el importe del primer pagaré y parte del segundo. Por esta razón el 19 de julio de 1978, Wallace solicitó del tribunal la ejecución de la sentencia. Oportuna-

mente embargó y subastó algunos bienes. No logró satisfacer toda su acreencia. Entonces procedió contra la afianzadora Commonwealth a través del Comisionado de Seguros, quien actuaba como su administrador liquidador.

El comisionado rechazó la reclamación. Adujo que la transacción entre Abarca y Wallace había liberado a la Commonwealth, pues se había producido la figura de novación extintiva. A juicio suyo, la transacción extinguió la relación jurídica existente entre Abarca y Wallace, y la emisión de pagarés creó una nueva obligación representada por esos documentos. Finalmente indicó que la transacción se llevó a cabo en contra de la voluntad del fiador, por lo que a tono con el Art. 1734 del Código Civil(¹) no le obligaba.

Inconforme, Wallace acudió al Tribunal Superior, Sala de San Juan. Dicho foro revocó. Sostuvo que no era aplicable la novación extintiva pues la situación jurídica posterior a la transacción no era incompatible con la situación anterior. Art. 1158 del Código Civil.(²) En abono de esa posición invocó los casos de *E.L.A.* v. *Urb. Damiro, Inc.*, 112 D.P.R. 244 (1982); *G. & J., Inc.* v. *Doré Rice Mill, Inc.*, 108 D.P.R. 89 (1978), y *Warner Lambert Co.* v. *Tribunal Superior*, 101 D.P.R. 378 (1973). Señaló, además, que la entrega de los pagarés, en ausencia de una intención de aceptarse pago, no extinguía la obligación. Art. 1124 del Código Civil.(³) *Warner*

---

(¹)"La transacción hecha por el fiador con el acreedor no surte efecto para con el deudor principal.

"La hecha por éste tampoco surte efecto para con el fiador, contra su voluntad." 31 L.P.R.A. sec. 4896.

(²)"Para que una obligación quede extinguida por otra que la substituya, es preciso que así se declare terminantemente, o que la antigua y la nueva sean de todo punto incompatibles." 31 L.P.R.A. sec. 3242.

(³)"El pago de las deudas de dinero deberá hacerse en la especie pactada, y no siendo posible entregar la especie, en la moneda de plata u oro que tenga curso legal en Puerto Rico.

"La entrega de pagarés a la orden, o letras de cambio u otros documentos mercantiles, sólo producirá los efectos del pago cuando hubiesen sido realizados, o cuando por culpa del acreedor se hubiesen perjudicado.

*Lambert Co.* v. *Tribunal Superior,* supra. Por último, la ilustrada sala sentenciadora concluyó que los mismos términos de las fianzas obligaban a Commonwealth.

A solicitud del comisionado revisamos.

## II

La solución justa del recurso nos mueve a exponer brevemente la doctrina jurisprudencial en torno a la naturaleza y propósito de la fianza judicial para levantar embargo, y a examinar por primera vez —a la luz de los planteamientos de las partes— en qué circunstancias los efectos novatorios de una transacción relevan a un fiador judicial.

 De inmediato, vale recordar que la nota característica de la fianza judicial radica en su *solidaridad.* Por ende, el fiador judicial no puede exigir la excusión de bienes del fiado. Art. 1755 del Código Civil; (⁴) *Stella, hoy su Sucn.* v. *Municipio,* 76 D.P.R. 783 (1954); *Santini Fertilizer Co.* v. *Roldán,* 49 D.P.R. 432 (1936). Castán, luego de citar la opinión de Manresa —expositiva de que tal condición se justifica a base de que los vínculos ante los tribunales deben ser más fuertes— señala que en "los demás, y en defecto de las normas que se establecen en cada caso por la ley o por la providencia judicial, se regirán la fianza legal y la judicial por las disposiciones del Código acerca de la convencional en cuanto les sean aplicables". J. Castán Tobeñas, *Derecho civil español, común y foral,* 11ma ed., Madrid, Ed. Reus, 1981, T. IV, pág. 752. A tal efecto, el Código Civil nos remite al tratamiento brindado a las obligaciones solidarias en los Arts. 1090 a 1101 (31

---

"Entretanto, la acción derivada de la obligación primitiva quedará en suspenso." 31 L.P.R.A. sec. 3174.

(⁴) En lo pertinente, reza:

"El fiador judicial no puede pedir la excusión de bienes del deudor principal." 31 L.P.R.A. sec. 4973.

L.P.R.A. secs. 3101–3112). Entre éstos, el Art. 1096([5]) reconoce, como causa de extinción de una obligación solidaria, la *novación*.

■ En el ámbito procesal, las Reglas de Procedimiento Civil de 1958, vigentes al comienzo de este litigio e iguales a las actuales, permitían a un demandante obtener un embargo preventivo. Su propósito es asegurar la sentencia que en su día pudiera recaer a su favor. Regla 56.1 (32 L.P.R.A. Ap. III). *Vda. de Galindo* v. *Cano*, 108 D.P.R. 277 (1979). No obstante, las reglas también proveían que un demandado pudiera levantar el embargo preventivo. Para ello éste debía *sustituir* los bienes embargados por una fianza que respondiera por el valor de los mismos. Regla 56.3. Igual norma subsiste hoy. Regla 56.3 (3) de Procedimiento Civil de 1979.

■ En *Vda. de Galindo* v. *Cano*, supra, pág. 283, explicamos que la función de esta fianza judicial, "tiene el efecto de sustituir los bienes embargados y no el de menoscabar la garantía para responder de la efectividad de la sentencia que pueda recaer a favor del demandante". Véase igual concepto vertido en *Benabe* v. *Corte*, 42 D.P.R. 896 (1931).

En *Sucrs. de L. Villamil & Co.* v. *Díaz y Laborda*, 41 D.P.R. 467 (1930), enfrentamos una situación parecida a la de autos. Allí, para asegurar la efectividad de la sentencia, la demandante embargó un automóvil. El demandado levantó el embargo al prestar la fianza requerida. El fiador era un tercero. Posteriormente las partes transigieron. Se acordó que el demandado haría una serie de pagos mensuales para extin-

---

([5])"La *novación*, compensación, confusión o remisión de la deuda, hechas por cualquiera de los acreedores solidarios, o con cualquiera de los deudores de la misma clase, *extinguen la obligación*, sin perjuicio de lo dispuesto en la sec. 3110 de este título.

"El acreedor que haya ejecutado cualquiera de estos actos, así como el que cobre la deuda, responderá a los demás de la parte que le corresponde en la obligación." (Énfasis suplido.) 31 L.P.R.A. sec. 3107.

guir la deuda, y se suspendería la ejecución de la sentencia a menos que el demandado dejara de cumplir su compromiso. El demandado incumplió y la parte demandante procedió contra el fiador. Éste esgrimió la defensa de que no se le había notificado la transacción. Rechazamos su contención. Sostuvimos la responsabilidad del fiador en virtud del lenguaje absoluto de la fianza y "la clara intención de las partes". *Sucrs. de L. Villamil & Co. v. Díaz y Laborda*, supra, pág. 469. La opinión no analizó ni discutió la transacción en su dimensión novatoria. En virtud de los planteamientos de las partes, nos corresponde ahora esa misión.

## III

La transacción y la novación, aunque ofrecen similaridades, son figuras jurídicas distintas. Como hemos expresado, la novación es una forma de extinguir las obligaciones. En cambio, la transacción es un contrato por el cual se evita o pone término a un litigio. A. Moxó Ruano, *Notas sobre la naturaleza de la transacción*, 34 Rev. Der. Privado 673, 689 (1950). En la transacción se *fija* una relación jurídica subjetivamente incierta consistente en un conflicto de pretensiones. A. Gullón Ballesteros, *La Transacción*, en *Tratado práctico y crítico de Derecho civil*, Madrid, Ed. Inst. Nac. Est. Jur., 1964, T. XLIII, Vol. 2, pág. 71. El cambio de lo incierto a lo certero ha sido calificado por algunos como *modificativo*. T. Ogáyar Ayllón, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Rev. Der. Privado, 1983, T. XXII, Vol. 2, pág. 4. No obstante, con casi absoluta unanimidad, la doctrina civilista se pronuncia a favor de que la transacción, per se, no constituye novación clásica. Gullón Ballesteros, *op. cit.*, págs. 75–78; Ogáyar Ayllón, *op. cit.*, págs. 4, 8, 18; G. Pescatore y C. Ruperto, *Codice Civile Annotato*, 7ma ed., Milán, Ed. Dott. A. Giuffré, 1978, pág. 1961, n. 4. El carácter novatorio de la transacción depende de cómo concibamos su naturaleza jurídica. Gullón Ballesteros, *op. cit.*, pág. 75. Se ha

debatido entre su naturaleza *traslativa* y *declarativa*. En el primer supuesto la transacción crea nuevos derechos. En el segundo sólo reconoce o declara derechos preexistentes. Naturalmente si la transacción es traslativa provocará necesariamente la novación. En cambio, si es declarativa, ese resultado no es inexorable. Gullón Ballesteros, *op. cit.*

La tradición romanística, fundada en el aforismo *transigere est alienare*, reconocía en la transacción naturaleza traslativa. (⁶) Pero la doctrina moderna, de origen francés, acepta la naturaleza declarativa de la transacción. Ogáyar Ayllón, *op. cit.*, pág. 6; Gullón Ballesteros, *op. cit.*, pág. 70. Así la transacción *"non est titulus, sed tituli confessio"*. Mazeud et Mazeud, *Leçons de Droit Civil*, 5ta ed., París, Ed. Montchrestien, 1980, T. III, Vol. 2, pág. 1091. Tal conclusión, sin embargo, debe cualificarse, pues como observa Mazeud, "la transacción sólo es declarativa en la medida que concierne a los derechos litigiosos". (Traducción nuestra.) Mazeud et Mazeud, *op. cit.*, pág. 1092.

 Con esta perspectiva en mente la doctrina ha distinguido entre la transacción pura y compleja. Es pura cuando versa únicamente sobre los derechos controvertidos; es

---

(⁶) En el Derecho Romano Clásico, algunos autores afirman que la transacción no es más que un *pactum* que pone fin a los litigios. Para que este *pactum* sirviera como medio de exigir el cumplimiento había que darle una "cobertura nueva basada en el *ius civile* por medio de la estipulación Aquiliana. Con esta estipulación se producía una novación que transformaba la primitiva reclamación del actor y su correspondiente acción en otra reclamación distinta". (Escolio omitido.) J. L. Murga, *Derecho Romano Clásico II: El Proceso*, Zaragoza, Secretariado de Publicaciones, Univ. de Zaragoza, 1980, pág. 269. *Cf.* J. Iglesias, *Derecho Romano: Instituciones de Derecho Privado*, 7ma ed., Barcelona, Ed. Ariel, 1984, pág. 535; A. d'Ors, *Derecho Privado Romano*, 3ra ed., Pamplona, Ed. Univ. de Navarra, S.A., 1977, págs. 485–486. No obstante, en la posterior evolución del derecho romano, la *transactio* fue concebida como un contrato innominado haciendo innecesaria la *stipulatio*. Murga, *op. cit.*, pág. 269. Se debate hasta qué punto la transacción fue novatoria en el Derecho romano en general. A. Moxó Ruano, *Notas sobre la naturaleza de la transacción*, 34 Rev. Der. Privado 673, 689 (1950).

compleja cuando se incluyen en la misma materias u objetos no litigados o cuestionados. En la transacción compleja se producen "efectos traslativos en orden a los objetos extraños al litigio; siendo sólo declarativa por lo que se refiere a los reconocimientos y renuncias de pretensiones". F. Puig Peña, *Tratado de Derecho Civil Español*, 2da ed., Madrid, Ed. Rev. Der. Privado, 1973, T. IV, Vol. 2, pág. 614. Así pues, la transacción puede tener un carácter mixto dependiendo del contenido que las partes le hayan dado a ésta en relación con la situación jurídica incierta que le dio vida.

■ Se ha dicho que la transacción tendrá carácter novatorio cuando "la situación anterior a la controversia es sustituida por la situación jurídica que origina la transacción". Ogáyar Ayllón, *op. cit.*, pág. 4; *cf.* Gullón Ballesteros, *op. cit.*, pág. 76, n. 42. Es decir cuando por voluntad de las partes el negocio transaccional elimina, *sustituye o modifica* —y no sólo fija— la anterior relación incierta. Gullón Ballesteros, *op. cit.*, pág. 77. Bajo este supuesto es imprescindible examinar la *intención* de las partes en la transacción. *Cf.* J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1982, T. II, Vol. 2, págs. 628–629; Castán Tobeñas, *op. cit.*, págs. 817–819. Esta encuesta debe realizarse sin hacer abstracción de la modificación *real* habida. En este sentido el análisis de los intereses económicos envueltos es esencial.[7] *Cf.* M. Godreau, *Esquema para la solución de problemas de Derecho civil patrimonial*, 55 Rev. Jur. U.P.R. 9 (1985).

IV

■ Apliquemos este enfoque al presente caso. Coincidimos con el comisionado en que el cuadro fáctico reseñado pro-

---

[7] Por tal motivo, no es suficiente ni determinante el análisis simple basado en la doctrina que asimila la transacción a la sentencia firme, criterio que adoptamos en *Sucn. Román* v. *Shelga Corp.*, 111 D.P.R. 782 (1981).

yecta una *extinción de la obligación principal* bajo la cual Commonwealth convino en prestar una "fianza solidaria" para el levantamiento de un embargo. Hemos visto cómo, entre las cláusulas estipuladas, Abarca y Wallace voluntariamente *se relevaron mutuamente de toda "reclamación" recíproca que tuvieran entre sí respecto a la deuda original.* Esa reclamación, así reemplazada, de convertirse en sentencia final y firme, fue la única que Commonwealth afianzó *originalmente* al expedir las fianzas. Al otorgarlas, la posible deuda de Abarca hacia Wallace no era líquida ni exigible. No se habían hecho las necesarias auditorías de los contratos. Con la transacción surgió posteriormente una *nueva* obligación mediante la cual Abarca satisfaría a Wallace ciertos pagarés a su vencimiento. Ciertamente ello no se contempló en el contrato de fianza ni en las representaciones que se le hicieron a Commonwealth para expedirla. En los comienzos del pleito la fiadora garantizó un "riesgo". Ahora garantizaría, sin su conocimiento y consentimiento, una obligación sustancialmente distinta nacida después, en ocasión de las partes convenir extinguir las reclamaciones mutuas existentes y sustituirla por el pago de una suma cierta y determinada en virtud de la transacción. Ello generó una relación diferente.

El análisis económico para cada decisión —la de otorgar fianza para levantar un embargo por una reclamación en ciernes e indeterminada, en contraste con la de afianzar el cumplimiento de una deuda u obligación exacta evidenciada por los tres pagarés expedidos— forzosa y lógicamente ha de ser totalmente distinto. Exige una solución jurídica diferente. (8) Adviértase que Abarca renunció a una reconvención,

---

(8) En el pasado hemos expresado que las fianzas otorgadas por lucro, mayormente por compañías dedicadas a este negocio, deben interpretarse liberalmente. *Cf. E.L.A.* v. *Urb. Damiro, Inc.,* 112 D.P.R. 244, 248 (1982); *Olazábal* v. *U.S. Fidelity, etc.,* 103 D.P.R. 448, 454 (1975); *Planned Credit of P.R., Inc.* v. *Page,* 103 D.P.R. 245, 259 (1975).

a todos sus derechos y defensas, en perjuicio de los mejores intereses de Commonwealth.

La obligación de Commonwealth era accesoria. No se presume y debe ser expresa. No se extiende más allá de lo contenido en ella. Art. 1726 (31 L.P.R.A. sec. 4876). Resolvemos que las actuaciones de Abarca y Wallace, mediante el mecanismo de transacción, produjeron una novación extintiva de la obligación. Esa conducta está afectada por el espíritu que nutre el principio encarnado en el Art. 1734, antes citado, de que la *transacción hecha por el deudor con el acreedor no surte efecto para con el fiador contra su voluntad.*

Vicente Guilarte Zapatero nos orienta sobre el alcance de esta disposición legal:

> Por el contrario, nuestro C.c. en el precepto presente admite explícitamente la transacción que, manteniendo la vigencia de la obligación principal y de la accesoria, *no debe alterar los respectivos términos en que deudor y fiador aparecen obligados si no es con su propio consentimiento y el del acreedor. Así, pues, los efectos de la transacción que, en su caso, se realice quedarán limitados a quienes sean parte en la misma.* Tal solución resulta plenamente correcta pues, como se ha dicho anteriormente, obligación principal y obligación de garantía, no obstante, su independencia y el nexo de accesoriedad que ofrecen, *constituyen relaciones con cierta autonomía y sustantividad y su modificación no debe, en principio, afectar sino a los que intervienen en el negocio de donde surge aquélla.* (Énfasis suplido.) V. Guilarte Zapatero, *Comentarios al Código Civil y compilaciones forales,*

---

· La presente decisión no es incompatible con ese enfoque doctrinario. No significa ni justifica, en ningún sentido que se vaya más allá del claro lenguaje de la obligación. No es carta blanca para imponer, mediante interpretación judicial, obligaciones que un fiador nunca pensó asumir. *Mun. San Juan* v. *Stadium & Coliseum Opers.,* 113 D.P.R. 490, 494 (1982).

Una sentencia luego de juicio ordinario, es el resultado de una dinámica procesal distinta. De ordinario, implica que el demandado obligado a prestar la fianza, tiene toda la oportunidad de defenderse y hasta de ganar el pleito, *vis à vis* una sentencia por estipulación donde, en muchas ocasiones, la parte más débil económicamente se vio precisada a allanarse o consentirla.

Jaen, Ed. Rev. Der. Privado, 1979, T. XXIII, pág. 164; *cf.* *National City Bank* v. *Guarch,* 50 D.P.R. 888, 895 (1937).

Finalmente, la reserva que hicieron Wallace y Abarca, de que el pago de la deuda establecida en ese momento estaría garantizada por la fianza, no es determinante. Carece de valor ante la naturaleza extintiva de la transacción, pues "la autonomia negocial dejada a las partes encuentra sus límites en la ley y no puede desvirtuar la esencia de las instituciones". J. Amorth, *La responsabilidad del deudor solidario,* Barcelona, Colección Nereo, 1963, Libro 4, Tít. I, Cap. III, pág. 296.

En resumen, la transacción convenida por las partes no obliga a Commonwealth. Distinto a los hechos que dieron margen a la conclusión arribada en *Sucrs. de L. Villamil & Co.* v. *Díaz y Laborda,* supra, estamos ante una transacción novatoria. La transacción, "aunque no es naturalmente una forma de extinción de las obligaciones, *en sí misma considerada,* puede, en ocasiones, dar lugar a una *novación* que, si tiene carácter extintivo, *originará la desaparición de la fianza . . .".* Guilarte Zapatero, *op. cit.,* págs. 292–293. (Énfasis nuestro.)

Por los fundamentos expuestos,[9] *se dictará sentencia que revoque el dictamen del Tribunal Superior, Sala de San Juan.*

---

[9]La interpretación brindada responde a la visión civilista que en materia *sustantiva* rige en nuestra jurisdicción —*Valle* v. *Amer. Inter. Ins. Co.,* 108 D.P.R. 692, 695–697 (1979). En el derecho norteamericano, en lo *procesal,* no existe tratamiento uniforme. Algunos tribunales sostienen que la estipulación entre demandante y demandado en un pleito no libera al fiador que sirve para levantar un embargo preventivo, *en ausencia de colusión o dolo que cause perjuicio al fiador. Meyer* v. *Jones,* 32 C.A. 378, 163 P. 67 (1916). Tampoco que la sentencia se haya obtenido en rebeldía, *Martiniello* v. *Robitaille,* 199 N.E. 534 (1936). Véanse: A. Stearns, *The Law of Suretyship,* 5ta ed., Cincinnati, 1951, Sec. 10.24; 16 Cal. Jur. 3d, *Creditor's Right & Remedies* Sec. 313 (1983); 7 C.J.S. *Attachment* Sec. 267 (1980); 6 Am. Jur. 2d *Attachment & Garnishment* Sec. 535 (1963).

El Juez Asociado Señor Rebollo López emitió opinión disidente. El Juez Presidente Señor Pons Núñez se inhibió.

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

Disentimos. Al leer la ponencia mayoritaria emitida por el Tribunal en el presente caso, curiosamente nos vienen a la mente las palabras que expresáramos en la opinión disidente que emitiéramos en *San Lorenzo Trad., Inc.* v. *Hernández,* 114 D.P.R. 704, 721 (1983) a los efectos de que "[l]o complicado y elaborado no necesariamente es lo jurídicamente correcto".

La opinión emitida por el Tribunal resulta verdaderamente sorprendente. Mediante la misma el Tribunal resuelve que una compañía de seguros que ha emitido una fianza judicial con el propósito de que una parte demandada "levante" un embargo —mediante la cual fianza había solidariamente garantizado "el pago de la reclamación . . . en el caso de que el demandante obtuviere sentencia definitiva y firme a su favor"— *queda exonerada de responsabilidad* al posteriormente mediar en el pleito sentencia por transacción en que se reglamenta el pago de lo adeudado; ello, supuestamente, por el fundamento de que la obligación solidaria contraída por la compañía de seguros quedó extinguida por razón de novación.

El Tribunal llega a la determinación antes mencionada, no obstante reconocer en la opinión que emite que "con casi absoluta unanimidad la doctrina civilista se pronuncia a favor de que la transacción, per se, no constituye novación clásica" y de admitir —realmente no hay otra alternativa— que los fundamentos aducidos y el resultado a que se llega en la misma son contrarios a *toda* la jurisprudencia de este Tribunal, vigente y pertinente a la materia aquí en controversia; *lo cual, naturalmente, hace completamente innecesario que nos extendamos en nuestra argumentación en contrario.*

La ausencia de visión sobre el efecto y las consecuencias que tendrá la decisión sobre la práctica de la profesión resulta evidente. La opinión hoy emitida por una mayoría de los señores jueces que integran el Tribunal sin lugar a dudas causará una enorme confusión y crisis a nivel de instancia. Ello es así por cuanto se esboza una "nueva" norma sin que se revoque la jurisprudencia vigente y sin que se le brinde a la profesión en general una explicación razonable de cuándo procede aplicar dicha jurisprudencia anterior y cuándo es de aplicación la "nueva" norma que hoy se implanta. Ello, unido al hecho de que la "nueva" norma, per se, tiene la consecuencia perjudicial de evitar la solución y terminación por transacción de cientos de litigios, tendrá un efecto devastador a nivel de instancia con el consiguiente perjuicio para las partes litigantes y para una sana y eficiente administración de la justicia en nuestro país.