EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Caguas Plumbing, Inc.<br>        Demandante-Apelante<br><br>                v.<br><br>Continental Construction, Corp. y otros<br>        Demandados-Apelados | Certiorari<br><br>2001 TSPR 164<br><br>155 DPR _____ |

Número del Caso: CC-2000-206
          Cons. CC-2000-214

Fecha: 30/noviembre/2001

Tribunal de Circuito de Apelaciones:
                              Circuito Regional II

Panel integrado por su Presidente, Juez Sánchez Martínez, la Jueza Ramos Buonomo y la Jueza Cotto Vives

Abogados de la Parte Demandante-Apelante:
                    Lcdo. Luis F. Montijo
                    Lcda. Marie L. Quiñones Tañon

Abogados de la Parte Demandados-Apelados:
                    Lcdo. Francisco A. Rosa Silva
                    Lcda. María E. Rosa Domenech

Materia:  Incumplimiento de Contrato y Cobro de Dinero

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Caguas Plumbing, Inc.

    Demandante-Apelante

      vs.                     CC-2000-206      Certiorari

                           Cons. CC-2000-214

Continental Construction,
Corp.; Insurance Company
Of North America y Persona
Natural o Jurídica 1, 2, 3
    Demandados-Apelados

Opinión del Tribunal emitida por el Juez Asociado señor Hernández Denton

San Juan, Puerto Rico, a 30 de noviembre de 2001.

**Hemos de abordar en este caso un contrato de fianza en el que se garantizaba separadamente, de un lado, el cumplimiento general del contrato y, de otro lado, el pago a obreros y materialistas. En dicho contrato de fianza se establecía un periodo prescriptivo de dos (2) años para reclamar por la garantía de cumplimiento general, y de un (1) año por la segunda de pago a los obreros y materialistas.**

Nos toca resolver si, por dicho contrato de fianza, la fiadora está obligada a responder ante un subcontratista, bajo la fianza de cumplimiento

**general, por labor y materiales no pagados, cuando ya había pasado el término para reclamar bajo la fianza de pago, pero no el de la de cumplimiento general de la obra.**

**Resolvemos que la fiadora no está obligada a pagar la reclamación de pago porque el término de la fianza había expirado al momento de hacerse el requerimiento.**

I

El 6 de junio de 1990 Transglobe Limited Partnership, S.E. ("Transglobe") y Continental Construction Corporation ("Continental") otorgaron un contrato para la construcción del complejo de vivienda Altos de Torrimar. Para garantizar, de un lado, el fiel cumplimiento del contrato por parte de Continental y, del otro, el pago a los obreros y materialistas, las partes decidieron asegurar la construcción del proyecto mediante el otorgamiento de un contrato de fianza con Insurance Company of North America ("ICNA") por el monto de seis millones doscientos mil dólares ($6,200,000), el costo total del proyecto.

Ese mismo año, Continental contrató a Caguas Plumbing para realizar las obras de plomería en el proyecto de Altos de Torrimar. El subcontrato fue perfeccionado el 26 de diciembre de 1990. El 2 de julio de 1992, Continental certificó "que las casas de la urbanización Altos de Torrimar se construyeron y están de acuerdo con los 'Plot Plans' aprobados por ARPE correspondientes a las mismas" mediante carta suscrita por el Ing. Jesús O. López, supervisor del proyecto. El 30 de diciembre de ese mismo año se vendió la última propiedad del proyecto. Finalmente, el 23 de abril de 1993, según consta en los documentos

que obran en autos, Continental completó la última reparación hecha al amparo de las fianzas otorgadas por mandato del Departamento de Asuntos del Consumidor.

## II

Mediante carta fechada el 16 de diciembre de 1994, Caguas Plumbing hizo una reclamación formal a ICNA en la que alegó que, al finalizar la obra de Altos de Torrimar, el contratista, Continental Construction, aún le adeudaba doscientos noventa y siete mil setecientos veintiséis dólares con nueve centavos ($297,726.09). Posteriormente, el 26 de febrero de 1996, la subcontratista radicó una demanda a esos mismos efectos. ICNA respondió con una moción de desestimación alegando, inter alia, que el plazo de Caguas Plumbing para presentar una reclamación de pago de mano de obra y materiales de construcción había vencido.

## A.

El Tribunal de Primera Instancia, Sala Superior de Bayamón, dictó una Resolución interlocutoria, erróneamente titulada Sentencia Parcial, el 20 de julio de 1999, archivada en autos al día siguiente, en la que dispuso, esencialmente, que Caguas Plumbing había presentado su reclamación a tiempo y podía recuperar de ICNA tanto lo alegadamente adeudado por concepto de mano de obra como de materiales. ICNA recurrió al Tribunal de Circuito de Apelaciones mediante Certiorari.

## B.

El Tribunal de Circuito de Apelaciones revocó al Tribunal de Primera Instancia. El foro intermedio determinó que existía controversia sobre cuándo Continental Construction había concluido sus labores en Altos de Torrimar y, a ese fin, ordenó al Tribunal de Primera Instancia determinar la fecha en que esto ocurrió. Una vez dilucidado ese punto, el foro de instancia debería dirimir si la reclamación de Caguas Plumbing se hizo dentro del periodo de un (1) año provisto por la fianza de pago. De así haberse hecho, habría de determinar si en efecto existía la deuda reclamada.

De determinar que Caguas Plumbing no presentó su reclamación a tiempo, el Tribunal de Primera Instancia debía dilucidar si tal incumplimiento causó perjuicio sustancial a la fiadora. De no ser así, también procedería la reclamación. El foro apelativo citó, a estos efectos, nuestra jurisprudencia en Ferrer v. Alliance Company of P.R., 93 D.P.R. 1 (1966), e Industrial Equip. Corp. v. Builders Ins. Co., 108 D.P.R. 290 (1979), en apoyo de su conclusión.

De concluir el Tribunal de Primera Instancia que la reclamación de Caguas Plumbing no procedía bajo la fianza de pago por ser tardía y causar perjuicio sustancial a la fiadora, dicho foro debía determinar si la subcontratista presentó su petición bajo el término de dos (2) años dispuesto en la fianza de cumplimiento. De ser ese el caso, Caguas Plumbing sólo podría reclamar lo aportado por concepto de materiales de construcción, más no así por concepto de mano de obra. Su

**conclusión en este aspecto surge también de su interpretación del caso de <u>Ferrer</u>, <u>supra</u>.**

III

Tanto la subcontratista, Caguas Plumbing, como la fiadora, ICNA, recurren ante nos. Caguas Plumbing imputa error al Tribunal de Circuito de Apelaciones por éste determinar que la subcontratista sólo tenía derecho a reclamar de la aseguradora ICNA lo adeudado por concepto de materiales, pero no lo adeudado por concepto de mano de obra.

ICNA, por su parte, arguye que el foro apelativo erró al concluir que Caguas Plumbing, como subcontratista, podía reclamar contra la fiadora tanto bajo la fianza de ejecución como bajo la de pago, no obstante la intención de las partes de afianzar las obligaciones separadamente. Además, sostiene que dicho foro erró al determinar que existía controversia en cuanto a la fecha en que Caguas Plumbing concluyó su trabajo en Altos de Torrimar. Por último, señaló que incidió el foro intermedio al exigirle a la fiadora que probara que había sufrido perjuicio por razón de la alegadamente inoportuna reclamación de Caguas Plumbing y al concluir que existía controversia en cuanto a la existencia de dicho perjuicio. De no haberse cometido estos errores, alega que debió haberse dictado sentencia sumaria a su favor desestimando la reclamación de Caguas Plumbing.

Oportunamente se consolidaron ambos recursos y, con el beneficio de sus respectivos alegatos, resolvemos todas las controversias.

IV

De entrada, dirimimos la controversia fáctica principal planteada por ICNA, es decir, la polémica en cuanto a la fecha en que tanto Caguas Plumbing como Continental concluyeron sus respectivas labores en el proyecto Altos de Torrimar.

Caguas Plumbing alega que, para efectos del periodo prescriptivo del contrato de fianza, la construcción en el proyecto Altos de Torrimar cesó durante el año 1994. Basa su planteamiento en la deposición tomada al Ing. Frank Cué, en la que éste declaró que creía que los trabajos de reparaciones en el proyecto se concluyeron en 1993 o 1994. El Ing. Cué no hizo una declaración categórica a esos efectos, según surge de la declaración misma.

Más allá de dicho testimonio, inconcluso cuanto más, la única evidencia de la fecha en que se completó la obra en Altos de Torrimar apunta al 2 de julio de 1992, fecha en que Continental certificó la conclusión del proyecto. Existe, sin embargo, prueba de trabajos de reparación hasta el 23 de abril de 1993. Dichos trabajos se realizaron por mandato del Departamento de Asuntos del Consumidor (DACO) y las fianzas que éste exige, no la fianza provista por ICNA. No existe ningún otro documento en los autos que, visto objetivamente, sugiera que en una fecha posterior a éstas se realizaron trabajos en el proyecto.

La interpretación más razonable del contrato de construcción lleva a concluir que el trabajo allí dispuesto incluía necesariamente toda obra de corrección o reparación, indistintamente de que se hiciera al amparo de la fianza de

**ICNA o por disposición de ley, siempre que respondiera a las obligaciones estipuladas en el contrato. A esos efectos, el Artículo 12 del convenio establece la obligación del contratista de corregir o reparar, a su costo, toda obra defectuosa o contraria a las especificaciones del arquitecto a cargo del proyecto y establece plazos y procedimientos para hacer valer esta obligación.**

**Por razón de los criterios que motivan nuestra conclusión en el caso de autos, sin embargo, no es esencial precisar cuál de las dos fechas es aplicable. Aún tomando como válida la fecha más favorable a Caguas Plumbing, su reclamación al amparo de la fianza de pago habría sido tardía e inoportuna.**

V

Como bien exponen ambas partes, la controversia jurídica principal del caso de autos se centra en la aplicabilidad a la reclamación de Caguas Plumbing de las primeras dos partes de la fianza en cuestión, tituladas, respectivamente, "Performance Bond" y "Labor and Materials Bond". Específicamente, nos lleva a examinar si al otorgarse una fianza en garantía del cumplimiento total de un contrato —una de cuyas cláusulas ordenaba al contratista a resarcir a los obreros y materialistas— conjuntamente a una fianza en garantía específica del mencionado pago, aplican las disposiciones de la primera o de la segunda fianza a una reclamación de cobro por labor y materiales.

A.

El contrato de fianza en cuestión estaba dividido en tres (3) partes. La primera, la fianza de cumplimiento ("Performance Bond") garantizaba al dueño de la obra (Transglobe) que el contratista (Continental) cumpliría el contrato de construcción a cabalidad y, de no hacerlo, que la fiadora (ICNA) respondería por el incumplimiento. Disponía que toda reclamación bajo esa fianza debía instarse a dos (2) años de hacerse el último pago bajo el contrato de construcción. Por último, en el párrafo final, limitaba expresamente al dueño de la obra, Transglobe, la capacidad para reclamar sobre la base de la fianza de cumplimiento, a exclusión de toda otra persona natural o jurídica.

La segunda parte, la fianza de pago, garantizaba a Transglobe que Continental pagaría a todo proveedor de mano de obra o materiales de construcción por la labor, servicio, equipo o material que hubiere contribuido. Disponía que toda reclamación de pago de labor o materiales debía hacerse en o antes de transcurrido un (1) año desde que Continental terminara la obra descrita en el contrato. Legitimaba, a su vez, a todo acreedor de pago por labor o materiales para reclamar lo adeudado a la aseguradora.

La fianza de pago, cabe notar, mencionaba expresamente que se emitía conjuntamente con la fianza de cumplimiento. Así, el monto de la fianza de cumplimiento y la fianza de pago era el mismo y equivalía al valor total del proyecto, es decir, seis millones doscientos mil dólares ($6,200,000), lo que significa que el total de las reclamaciones por incumplimiento y por falta

de pago que merecerían indemnización por parte de la fiadora no habría de exceder esta cantidad.

La tercera parte correspondía a la fianza a favor del Secretario del Trabajo y Recursos Humanos, cuya expedición es mandatoria por virtud de la Ley Núm. 111, supra. Garantizaba el pago de salarios a los obreros y empleados del proyecto de construcción. Por disposición de ley, reiterada en el documento, la causa de acción concedida "se entenderá prescrita al año de concluida la obra y al año de haberse terminado toda labor en la misma." 29 L.P.R.A. sec. 200.

Los tres documentos llevaban el mismo número de fianza, 67PR-13312. Tanto la fianza de cumplimiento como la fianza de pago incorporaban el contrato de construcción por referencia. Son las primeras dos partes las que nos conciernen.

B.

Caguas Plumbing entiende que la fianza de cumplimiento por sí sola garantizaba el cumplimiento de la totalidad del contrato, inclusive los incisos 9.6.2 y 9.6.5. Rezan dichas cláusulas:

> **9.6.2** The Contractor shall promptly pay each subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled, reflecting percentages actually retained from payments to the Contractor on account of such Subcontractor's portion of the Work. The Contractor shall, by appropriate agreement with each Subcontractor, require each Subcontractor to make payments to Sub-subcontractors in similar manner.

> **9.6.5** Payment to material suppliers shall be treated in a manner similar to that provided in Subparagraphs 9.6.2, 9.6.3 and 9.6.4.

ICNA sostiene, por el contrario, que el hecho que se hubiera otorgado una fianza de pago conjunta y simultáneamente con la fianza de cumplimiento milita contra la alegación de Caguas Plumbing. La existencia de ambas fianzas, indica, debe interpretarse como expresiva de la voluntad de las partes contrayentes de afianzar separada e independientemente la obligación de pagar a los obreros y materialistas de la obligación de responder ante el dueño del proyecto por el cumplimiento del contrato. Distingue además el caso de autos de nuestra jurisprudencia anterior.

Caguas Plumbing basa su argumento en el lenguaje literal de la fianza de cumplimiento y en la creciente liberalización en la interpretación del contrato de fianza que ha favorecido la doctrina. ICNA plantea que la diáfana voluntad de las partes prevalece sobre una lectura literal que además atiende sólo una parte del convenio. Distingue los casos resueltos por este tribunal que admiten el cobro de salarios de una fianza de cumplimiento al señalar que allí el Tribunal se enfrentó a una sola fianza, no a dos fianzas independientes. Como explicaremos, ICNA tiene razón.

VI

La interpretación del contrato de fianza ha sufrido importantes cambios doctrinales ante la reciente profesionalización de la industria aseguradora. En los orígenes de esta figura jurídica, el Derecho interpretaba restrictivamente los contratos de fianza para así favorecer al

fiador, quien usualmente asumía su función sin ánimo de lucro,

y así alentar esta importante práctica.

> La interpretación restrictiva tuvo su auge en el
> tiempo en que los fiadores personales, por un mero
> acto de liberalidad, afianzaban el contrato de obra
> pública, pero perdió su popularidad con el
> advenimiento de las compañías fiadoras que se dedican
> al negocio de prestar fianza mediante el pago de
> primas. Cristy & Sánchez v. E.L.A., 84 D.P.R. 234, 244
> (1961).

La transformación del oficio del fiador en una industria

lucrativa llevó a la doctrina a favorecer una interpretación más

liberal de dichos contratos, conducente a expandir la protección

de los terceros beneficiados. Nuestra jurisprudencia tomó esta

nueva dirección, especialmente a los efectos de reconocer una

amplia legitimación a obreros, materialistas y subcontratistas

para reclamar del monto de las pólizas. Cristy & Sánchez v.

E.L.A., supra; A. L. Arzuaga, Inc. v. La Hood Const., Inc., 90

DPR 104 (1964); Ferrer v. Alliance Company of P.R., supra.


                                    A.

Huelga decir, sin embargo, que la interpretación de un

contrato de fianza no está exenta de la aplicación de las reglas

de hermenéutica dispuestas en la ley. Observamos que nuestro

Código Civil manda a interpretar los contratos de forma que

prevalezca la verdadera intención que tuvieren las partes al

contratar. Cód. Civ. Art. 1233, 31 L.P.R.A. sec. 3471. Para

lograr este fin, las cláusulas del convenio deben leerse de forma

integrada e interpretarse las unas por las otras, resolviendo

cualquier ambigüedad de modo que todas sus partes surtan efecto.

Id. en los Arts. 1236 y 1237, 31 L.P.R.A. secs. 3474 y 3475. De ahí, el principio análogo aplicable a la interpretación estatutaria: "[l]as partes al contratar lo hacen con el propósito de que sus pactos y convenciones tengan efectividad y no para que resulten declaraciones baldías e ilusorias." Morales Garay v. Roldán Coss, 110 D.P.R. 701, 707 (1981). Véase también, Merle v. West Bend Co., 97 D.P.R. 403, 409-411 (1969); Rutledge v. Gill, 78 D.P.R. 698, 706 (1955); Caballero v. Kogan, 73 D.P.R. 666, 674 (1952); Chiqués v. Registrador, 34 D.P.R. 597, 601 (1925).

Las citadas reglas de hermenéutica, por emanar de la ley misma, prevalecen sobre las tendencias interpretativas que los tribunales han de dar a uno u otro tipo de contrato. A tenor con estos principios, hemos resuelto que, en caso que el texto de un contrato de fianza sea claro, o que el verdadero significado de sus cláusulas pueda ser fácilmente discernido, los tribunales deben atenerse a su texto. En Mun. de San Juan v. Stadium & Coliseum Opers., 113 D.P.R. 490, 493-94 (1982) dijimos que "[l]a doctrina prevaleciente" que manda a interpretar liberalmente una fianza de cumplimiento y pago "a favor de su beneficiario […] no es carta blanca al poder judicial para descartar los pactos y convenios entre las partes". (Citas omitidas). Si un contrato de fianza consigna específicamente cuales son las circunstancias por las que responde el fiador, el tribunal no puede imponerle responsabilidad más allá de lo pactado.

Reiteramos este principio en García v. The Commonwealth Ins. Co., 118 D.P.R. 380, 391-92 (1987). Citando Mun. de San Juan, supra, explicamos que la doctrina de interpretación liberal de

la fianza tenía como límite natural el principio mayor de la supremacía de la voluntad de las partes:

> En el pasado hemos expresado que las fianzas otorgadas por lucro, mayormente por compañías dedicadas a este negocio, deben interpretarse liberalmente. […]

> La presente decisión no es incompatible con ese enfoque doctrinario. No significa ni justifica, en ningún sentido que se vaya más allá del claro lenguaje de la obligación. No es carta blanca para imponer, mediante interpretación judicial, obligaciones que un fiador nunca pensó asumir. (Citas omitidas).

En conclusión, si bien nuestra jurisprudencia ha resuelto que un contrato de fianza ha de interpretarse liberalmente, de modo que favorezca las reclamaciones de terceros beneficiados, dicha interpretación no puede abstraerse de la verdadera intención de las partes. Debe atenderse, en primer plano, el texto del contrato, visto en su totalidad y de acuerdo a las reglas de hermenéutica dispuestas en nuestro Código Civil.

B.

El subcontratista, Caguas Plumbing, sostiene que la fianza de cumplimiento ("Performance Bond"), al expedirse para garantizar el fiel descargo de todas las obligaciones del contrato, y al incorporar, por referencia, el texto del convenio, obliga a la fiadora a responder por cualquier violación a las cláusulas pactadas, inclusive los incisos 9.6.2 (por el que el contratista se obligaba a hacer a los subcontratistas el pago del trabajo por éstos realizado) y 9.6.5 (por el que se disponía para el pago a materialistas, de modo análogo al pago a

subcontratistas). Basa su planteamiento en la determinación del Tribunal de Circuito de Apelaciones que concluyó que, no obstante el hecho de que todas las fianzas otorgadas estaban identificadas con el mismo número, 67PR13312, la fianza de cumplimiento y la fianza de pago constituían dos contratos de fianza independientes, por lo que el cumplimiento de cada uno podía exigirse independientemente. Así, arguye Caguas Plumbing, a pesar de existir una fianza de pago para el propósito expreso de satisfacer posibles reclamos de salarios y costo de materiales, la fianza de cumplimiento general también responde por tales reclamos e incluso permite su interposición en un plazo distinto y mayor al de la fianza de pago. Su argumento, que torna la fianza de pago en una mera declaración vacía y redundante, no nos convence.

La amplia libertad que nuestro ordenamiento reconoce a los contrayentes admite que en un mismo contrato de fianza se aseguren varias obligaciones e incluso se señalen distintos plazos y condiciones para su eventual cumplimiento. Ninguna disposición del Código Civil limita esa potestad. Así, en un mismo contrato pueden pautarse distintas condiciones, inclusive distintos periodos prescriptivos, para exigir pago al fiador de acuerdo al tipo de reclamación interpuesta o a la identidad de los reclamantes.

Ambas fianzas, entonces, al leerse conjuntamente, como disponen las reglas de hermenéutica, llevan a la conclusión de que la fianza de pago fue concebida como remedio primario y exclusivo para reclamar el resarcimiento de expendios de labor

y materiales, y la de cumplimiento como remedio del dueño ante el incumplimiento del contrato.

La fianza otorgada, vista en su totalidad, afianzaba el conjunto de obligaciones que Continental habría de contraer, tanto en la construcción de la obra, como en el pago a quienes trabajaran en el proyecto. No obstante, cada una de las dos partes de la fianza debe entenderse como garantía de una parte distinta del conjunto, es decir, la fianza de cumplimiento (Performance Bond) como garantía de la construcción de la obra, y la fianza de pago (Labor and Materials Payment Bond), como garantía de resarcimiento de salario a los obreros.

**El texto mismo de la fianza de pago la hace dependiente de la fianza de cumplimiento, al indicar, en la primera página del documento "[t]his bond is issued simultaneously with performance bond in favor of the owner conditioned on the full and faithful performance of the contract". Se consigna de ese modo el propósito expreso de los contrayentes de entender ambos documentos como uno sólo. A ésta conclusión abona el que una sola suma responda por ambas clases de obligaciones. El cumplimiento del proyecto, y el pago a obreros y materialistas se pueden reclamar hasta el valor total del proyecto.**

De interpretar la fianza de cumplimiento en abstracto, separada de la fianza de pago, como intenta hacer Caguas Plumbing, la segunda sería superflua, pues la de cumplimiento cumpliría cabalmente su propósito. Haría de la fianza de pago una mera declaración innecesaria y redundante. El derecho, hemos visto, aborrece las interpretaciones que quitan efectividad a

las cláusulas contractuales válidamente acordadas. Rechazamos, pues, la interpretación de Caguas Plumbing.


C.

Al determinar que la reclamación de Caguas Plumbing se presentó tardíamente, se hace innecesario responder al señalamiento de error del subcontratista. Como ya hemos mencionado, las reclamaciones por concepto de materiales, por disposición de la fianza de pago, están sujetas al mismo periodo prescriptivo que las reclamaciones por concepto de mano de obra. Incluso Caguas Plumbing así lo entiende en su comparecencia ante nos.


VII

Finalmente, el Tribunal de Circuito de Apelaciones resolvió que, independientemente de los términos prescriptivos anteriormente discutidos, la fiadora sólo se libera de su responsabilidad en tanto y en cuanto logre probar que la reclamación tardía de Caguas Plumbing le causó algún perjuicio. En su recurso ante nos, ICNA sostiene que lo resuelto por el foro apelativo no se ajusta a la interpretación del contrato de fianza que han hecho tanto los tratadistas como este Tribunal. A estos efectos, nos pide que aclaremos nuestra decisión en Industrial Equip. Corp. v. Builders Ins. Corp., 108 D.P.R. 290 (1979), en tanto contradice lo resuelto anteriormente en Caribe Lumber v. Inter-Am. Builders, 101 D.P.R. 458 (1973), y la doctrina

mayoritaria norteamericana, y revoquemos la determinación del Tribunal de Circuito de Apelaciones.

En Industrial, supra, nos enfrentamos a un contrato de fianza que contenía una cláusula que disponía que cualquier reclamación que surgiese de dicho contrato se debía traer dentro de un periodo de un (1) año desde concluidos los trabajos en el proyecto de construcción, o desde que el principal dejara de pagarle al acreedor. El demandante había presentado su demanda pasado dicho plazo, pero había hecho varias reclamaciones extrajudiciales dentro del año. La controversia, pues, giró en torno a si dichas reclamaciones extrajudiciales interrumpieron el plazo establecido en el contrato por ser el mismo uno de prescripción, o si, por otra parte, el plazo no estaba sujeto a interrupción por ser un plazo de caducidad.

Resolvimos en esa ocasión que el plazo para reclamar pactado en dicho contrato de fianza era un plazo prescriptivo. Como tal, dicho plazo había sido interrumpido por las reclamaciones extrajudiciales, y la demanda había sido presentada a tiempo. Como la demanda había sido instada conforme con la condición dispuesta en el contrato de fianza, la fiadora no había quedado liberada.

Tras resolver de esta manera, entramos en una discusión sobre el Art. 1751 del Código Civil, 31 L.P.R.A. sec. 4956. Dicho Artículo dispone que los fiadores quedan libres de su obligación "siempre que por algún hecho del acreedor no puedan quedar subrogados en los derechos, hipotecas y privilegios del mismo." 31 L.P.R.A. sec. 4956. Este Artículo opera para liberar

al fiador de su responsabilidad. Sin embargo, aclaramos que dicha disposición está limitada por la interpretación liberal que se le da al contrato de fianza a través de la regla esbozada en Olazábal v. U.S. Fidelity, Etc., 103 D.P.R. 448 (1975): "Como regla general, la fiadora quedará liberada de responsabilidad frente al acreedor **únicamente hasta el grado en que las actuaciones de éste hayan perjudicado los intereses o derechos de aquélla.**" (Enfasis suplido).

Correctamente expone también Olazábal, supra, citando Ulpiano Casal, Inc. v. Totty Mfg. Corp., 90 D.P.R. 739, 745 (1964), la razón de ser de esta interpretación liberal:

> Ya no rige la antigua doctrina elaborada en los tiempos de fiadores gratuitos al efecto de que la menor violación del contrato por parte del dueño relevaba a la fiadora de responsabilidad in toto. Por ello hemos sostenido que: 'El principio de que un fiador es un favorito del derecho no es de aplicación propiamente en el caso de una compañía organizada con el propósito expreso de actuar como fiadora mediante compensación.'...
>
> Conscientes como estamos de que de ordinario las fianzas ya no se prestan por mera liberalidad sino mediante paga, hemos abandonado la doctrina de interpretación restrictiva de las fianzas de construcción y en su lugar hemos adoptado una interpretación liberal.

Así pues, intimamos en Industrial, supra, que para liberar a un fiador de su responsabilidad cuando el acreedor ha instado su demanda fuera del plazo dispuesto en el contrato de fianza es necesario que dicho fiador pruebe que la tardanza del demandante le causó perjuicio.

Sin embargo, en <u>Caribe Lumber</u>, <u>supra</u>, resolvimos que cuando un demandante no cumple con el plazo pactado en un contrato de fianza para notificar o instar una reclamación, la causa de acción se pierde automáticamente, como con cualquier otro plazo prescriptivo y/o de caducidad, sin necesidad de que la fiadora pruebe que la tardanza le causó perjuicio. Lo intimado por este Tribunal en <u>Industrial</u>, <u>supra</u>, en cuanto a la aplicación del Art. 1751 a ese caso, parece contradecir, pues, lo resuelto en <u>Caribe Lumber</u>, <u>supra</u>. Entendemos que este asunto merece una discusión detallada.

Debemos repetir que la controversia que se presentó y se resolvió en <u>Industrial</u>, <u>supra</u>, era en cuanto a si el plazo pactado en el contrato de fianza era uno de caducidad o de prescripción. Resuelto que el plazo era de prescripción, que las reclamaciones extrajudiciales habían interrumpido el plazo, y que la demanda había sido presentada a tiempo, no quedaba más nada por resolver en dicho caso. Por lo tanto, las expresiones subsiguientes en cuanto a la necesidad de probar perjuicio para desestimar una demanda por incumplimiento con el plazo pactado en un contrato de fianza, no constituyeron el *ratio decidendi* de la opinión, son *dicta*, y no gozan de valor de precedente.

**El Artículo 1751 dispone: "Los fiadores, aunque sean solidarios, quedan libres de su obligación siempre que por algún hecho del acreedor no puedan quedar subrogados en los derechos, hipotecas y privilegios del mismo." 31 L.P.R.A. sec. 4956. Esta disposición existe por el carácter especial del contrato de fianza. "La doctrina estima, generalmente, que la norma es una**

consecuencia lógica y jurídica del artículo [1738], que, como se ha visto, tipifica un caso de subrogación legal, cuyo ejercicio debe ser tutelado, sancionando la conducta del acreedor que lo impida." Vicente Guilarte Zapatero, Comentarios al Código Civil y Compilaciones Forales, dirigidos por Manuel Albaladejo, Tomo XXIII en la pág. 407. En un contrato de fianza el fiador se compromete a pagar al acreedor en caso de que el deudor incumpla el contrato subyacente. 31 L.P.R.A. sec. 4871. Sin embargo, a diferencia de en el contrato de seguro, en la fianza el fiador puede repetir contra el deudor, subrogándose en la posición del acreedor, una vez dicho fiador haya cubierto la deuda del deudor. 31 L.P.R.A. sec. 4912. Véase además, Guilarte Zapatero, supra, en las págs. 265 et seq. A cambio de este derecho, el fiador cobra una prima más baja por la fianza que la que cobraría una aseguradora por un seguro. Caribe Lumber, supra, en las págs. 468-469.

Ahora bien, al pactar el contrato de fianza el fiador toma en cuenta ciertas garantías que lo pueden ayudar a repetir contra el deudor en el caso de que éste incumpla el contrato principal. Por ejemplo, el fiador puede haber exigido que se incluyeran ciertas cláusulas en el contrato principal que limiten la cantidad de dinero que se le desembolsará al deudor como adelantos. El fiador también puede haberse asegurado que el deudor tuviese suficientes activos en el país que él podría embargar de verse en la necesidad de hacerlo. De esta manera, el fiador sabe de antemano la posición en la cual se encontrará

**si el deudor incumple y se ve en la necesidad de subrogarse en la posición del acreedor.[1]**

El Artículo 1751 surge para proteger estas legítimas expectativas del fiador. Si el acreedor actúa de manera que perjudique la posición en la cual el fiador ha de encontrarse al subrogarse en los derechos de dicho acreedor, el Artículo 1751 protege al fiador.[2] Por ejemplo, si el acreedor le hizo más adelantos de dinero al deudor de los que estaban estipulados en el contrato; o si dejó perder alguna hipoteca sobre algún inmueble del deudor; o si, en un caso extremo, le gestionó al deudor un barco para poder llevarse sus grúas y sus camiones para República Dominicana; cuando el fiador se subrogue en los derechos del acreedor y no le pueda embargar bienes al deudor porque ya no los tiene o porque están todos fuera de la jurisdicción, dicho fiador puede liberarse de su obligación de pagarle al acreedor en tanto y en cuanto su negligencia al dejar

---

[1] "[E]l fiador... imtercede en una obligación de otro que tiene características determinadas en el débito y en la responsabilidad; asume el cumplimiento de una obligación ajena que presume una determinada relación entre sus elementos constitutivos, y si tal relación se altera, es el acreedor y no el fiador quien debe soportar las consecuencias; éste puede confiar en la diligencia de aquél a fin de tutelar su derecho y mantener íntegra la garantía ofrecida por el patrimonio del deudor o la específica inherente a la obligación fiada." Guilarte Zapatero, supra, en las págs. 407-408.

[2] "[S]i el derecho o la subrogación que corresponde al fiador ha sido lesionado, se opera un cambio en las condiciones de actuación de la obligación garantizada existentes al tiempo de constituirse la fianza y que fueron tenidas en cuenta al asumir ésta, presumiendo que podría contar con todos los derechos y acciones del acreedor a efectos de resarcirse de lo que, eventualmente, debiera pagar. Si esto se hace imposible por hecho del acreedor, el perjuicio del fiador sólo se recompensa con la extinción de la fianza." Id. en la pág. 408.

que el deudor se escapara le imposibilitó al fiador repetir contra el deudor.

Sin embargo, el Artículo 1751 no sirve para clasificar al fiador como figura desfavorecida por el ordenamiento jurídico. Dicho Artículo limita la liberación del fiador en estos casos al perjuicio que se le cause porque anteriormente la doctrina permitía que el fiador se liberara **completamente** de su responsabilidad por **cualquier** actuación del acreedor que perjudicara su capacidad para subrogarse. Véase, Olazábal, supra, en la pág. 454. Esta regla, sumamente favorable al fiador, existía por ser el mismo una figura favorita del derecho cuando las fianzas se prestaban sin cobrar primas. Id. Al convertirse la fianza en un negocio como cualquier otro, se limitó el alcance de esta regla para llegar a un resultado más equitativo. Id.

Aclaramos, pues, que el Artículo 1751 y la regla que establece que un fiador se libera de su responsabilidad en tanto y en cuanto los actos del acreedor le causen perjuicio, es de aplicación **exclusivamente a los actos del acreedor que imposibilitan que el fiador se subrogue en sus derechos**. Así expresamos en E.L.A. v. Urb. Damiro, Inc., 112 D.P.R. 244, 249 (1982), que "[s]i no existe nexo causal entre el acto del acreedor y el impedimento en la subrogación" no es de aplicación el Artículo 1751. "El precepto exige una conexión directa entre el 'hecho del acreedor', positivo y negativo, según los casos, y la imposibilidad de subrogación del fiador. Es precisa, pues, la correspondiente relación de causa a efecto, de modo que la conducta del acreedor sea determinante de la pérdida del derecho

o de la garantía de que se trate." Guilarte Zapatero, supra, en la pág. 421.

Por lo tanto, es de aplicación el Artículo 1751 sólo cuando la actuación del acreedor ha afectado algún derecho del fiador **oponible contra el deudor en el caso de que el fiador intente subrogarse en la posición del acreedor**. En el caso de autos sucede algo muy diferente. En esta ocasión lo que ocurrió fue que el acreedor (la subcontratista) no instó su demanda **contra la fiadora** dentro del plazo de un (1) año dispuesto en el contrato de fianza. El único derecho que se ve afectado por esta negligencia del acreedor es su propio derecho a recobrar de la fiadora. No se ve envuelto aquí ningún derecho del acreedor con respecto al deudor que la fiadora hubiese podido adquirir al subrogarse en la posición del acreedor. Tampoco imposibilita dicha actuación la capacidad de la fiadora para subrogarse. Por lo tanto, el Artículo 1751 no tiene nada que ver con la situación de autos en la cual el acreedor (la subcontratista) no cumplió con el plazo pactado en el contrato de fianza para demandar a la fiadora.

Aclaradas, pues, nuestras expresiones en Industrial, supra, teniendo en cuenta que las mismas constituyeron *dicta*, y siguiendo el precedente establecido por nuestra decisión en Caribe Lumber, supra, resolvemos que la fiadora no tiene que probar que la tardanza del acreedor al demandar le causó perjuicio alguno. En este caso hay una clara e inequívoca expresión de la voluntad de las partes contrayentes. Debemos recordar que en los casos en los cuales no aplica la regla

especial del Artículo 1751, se debe observar el principio general de que "[l]a obligación del fiador se extingue... por las mismas causas que las demás obligaciones." 31 L.P.R.A. sec. 4951. Así, la mención de un término específico para instar una reclamación al amparo de una fianza prevalece independientemente del perjuicio que pudo haber sufrido o dejado de sufrir la fiadora. De otro modo se daría al traste con el principio más fundamental del derecho de contratos: pacta sunt servanda. Paine Webber v. Service Concepts, Inc., res. el 13 de junio de 2000, 2000 TSPR 85. En el caso de autos se pactó voluntariamente por las partes que toda reclamación se instaría en un periodo de un (1) año. Esta limitación constituye ley entre las partes. 31 L.P.R.A. sec. 2994.

VIII

El texto del contrato de fianza del caso de autos, visto a través de las citadas reglas de interpretación contractual y nuestra jurisprudencia, nos lleva a resolver que la fianza de pago, no la de cumplimiento, es el remedio que Caguas Plumbing tenía disponible para reclamar resarcimiento por concepto de materiales de construcción y mano de obra.

Por tanto, el periodo prescriptivo para reclamar su pago ante la aseguradora era el de un (1) año dispuesto en la fianza de pago, no el de dos (2) años consignado en la fianza de cumplimiento. Tomando como punto de partida la fecha en que

concluyó la última reparación documentada en Altos de Torrimar, el 23 de abril de 1993, la reclamación de Caguas Plumbing, presentada el 16 de diciembre de 1994, se dio fuera de término. ICNA no está obligada a atenderla. Por ende, procede revocar el dictamen del Tribunal de Circuito de Apelaciones.

Se dictará la Sentencia correspondiente.


FEDERICO HERNÁNDEZ DENTON
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Caguas Plumbing, Inc.

    Demandante-Apelante

       vs.

Continental Construction,
Corp.; Insurance Company
Of North America y Persona
Natural o Jurídica 1, 2, 3
    Demandados-Apelados

CC-2000-206     Certiorari
Cons. CC-2000-214

SENTENCIA

San Juan, Puerto Rico, a 30 de noviembre de 2001.

Por los fundamentos expuestos en la Opinión que antecede la cual se hace formar parte íntegra de la presente, se revoca la Sentencia del Tribunal de Circuito de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos de forma consistente con lo aquí resuelto.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri disiente sin opinión escrita.

Isabel Llompart Zeno
Secretaria del Tribunal Supremo