Opinión disidente emitida por el
Juez Asociado Señor Martínez Torres,
a la que se une el Juez Asociado Señor Feliberti Cintrón.
Entiendo que la definición de joint venture que hoy acoge la mayoría de este Tribunal trastoca el esquema de disolución de corporaciones que dispuso la Ley General de Corporaciones de 1995, Ley 144-1995, aplicable a este caso. Por eso, disiento respetuosamente.
Darle al término joint venture o empresa común el am-plio significado que propone la mayoría de este Tribunal tiene el efecto de hacer aplicable el procedimiento de diso-lución expedito que proveía el Art. 9.03 (14 L.P.R.A. sec. 3003 (ed. 2008)), a cualquier corporación cuya titularidad recaiga en dos accionistas en partes iguales. El Art. 9.03, supra, era una excepción y, como tal, debe reservarse para casos excepcionales. Debe limitarse a aquellas empresas cuyas operaciones no tengan la intención de ser continuas.
I
Pharmaceutical Generic Developers, Inc. (P.G.D.) es una corporación regular con fines de lucro que se registró *66 en el Departamento de Estado de Puerto Rico el 21 de abril de 1998. La corporación se dedica a la venta de productos farmacéuticos genéricos. Desde sus inicios contó con los se-ñores José C. Lloréns y Rafael Arribas como sus dos únicos accionistas.
Al cabo de algunos años, afloraron diferencias entre ambos. Esa situación desembocó en que el señor Lloréns renunciara como oficial y director de P.G.D. Desde enton-ces no se han celebrado juntas de accionistas para elegir nuevos directores, por lo que el señor Arribas ha estado en control de la junta de directores desde entonces.
El 2 de agosto de 2006 el señor Lloréns solicitó la diso-lución de la corporación ante el Tribunal de Primera Ins-tancia, al amparo del Art. 9.03 de la Ley General de Cor-poraciones de 1995, supra. Este artículo provee un procedimiento de disolución expedito para las empresas co-munes que pertenezcan a dos accionistas en partes iguales.
Oportunamente, el señor Arribas se opuso a la disolución. Argumentó que procedía la desestimación de la demanda porque P.G.D. no es una empresa común y, por consiguiente, la demanda no justificaba la concesión de un remedio. Mientras, P.G.D. solicitó intervenir en el proceso.
Luego de varios trámites procesales, y oposiciones de las partes a los escritos de la parte contraria, el 16 de septiem-bre de 2008 el Tribunal de Primera Instancia emitió una resolución en la que, a pesar de que descartó la aplicación del Art. 9.03, supra, por entender que P.G.D. no era una empresa común, se negó a desestimar la demanda. Enten-dió meritorio dilucidar ciertos hechos que estaban en con-troversia ante la posibilidad de que existiera un remedio en la ley o en los principios de equidad que atendieran los reclamos del señor Lloréns.
Inconformes, ambas partes presentaron recursos de cer-tiorari ante el Tribunal de Apelaciones. El señor Lloréns señaló que el Tribunal de Primera Instancia erró al no aplicar el Art. 9.03 de la Ley General de Corporaciones, *67 supra. Por otro lado, el señor Arribas se mostró conforme con la determinación de inaplicabilidad de esa disposición porque alega que P.G.D. no era una empresa común. No obstante, señaló que erró el tribunal al no desestimar la demanda porque el demandante no tiene una reclamación que justifique un remedio.
El Tribunal de Apelaciones revocó. Concluyó que el Art. 9.03, supra, era aplicable a P.G.D., amparándose en la evo-lución que ha tenido el concepto joint venture en la juris-prudencia de Delaware, que favorece su aplicación a em-presas que se dedican a más de una sola transacción.
Nuevamente en desacuerdo, el señor Arribas y P.G.D. comparecen ante nos mediante recurso de certiorari. Insis-ten en que el concepto joint venture no abarca las operacio-nes de P.G.D. Oportunamente, el señor Lloréns se opuso a la expedición del auto. El 11 de diciembre de 2009 lo expedimos. La opinión mayoritaria confirma al Tribunal de Apelaciones.
II-A
La Ley General de Corporaciones de Puerto Rico de 1995 atendía la disolución de las corporaciones en diferen-tes capítulos, en atención al tipo de corporación de que se tratara. Por ejemplo, el Capítulo 9 (14 L.P.R.A. see. 3001 et seq. (ed. 2008)) atendía la disolución de la corporación general; el Art. 14.17 (14 L.P.R.A. sec. 3217 (ed. 2008)), aplicaba a la disolución de las corporaciones íntimas, y los Arts. 19.47 y 19.48 (14 L.P.R.A. secs. 3432a y 3433 (ed. 2008)), trataban sobre la disolución de las corporaciones de responsabilidad limitada.
El Art. 9.03, supra, trataba sobre la disolución de las corporaciones de empresa común cuya titularidad recayera *68 en dos accionistas en partes iguales.(1) Este artículo dispo-nía:

Art. 9.03 Disolución de una corporación de empresa común de dos accionistas.

(a) Si los accionistas de una corporación organizada con arreglo a las leyes del Estado Libre Asociado, que tenga sólo dos (2) accionistas, cada uno de los cuales posea el cincuenta por ciento (50%) de las acciones de la misma, se dedicasen al logro de una empresa común (joint venture), y si tales accio-nistas no pudiesen llegar a un acuerdo en torno a la deseabi-lidad de descontinuar tal empresa común y para disponer de los activos utilizados en dicha empresa, cualquiera de dichos accionistas podrá radicar en el Tribunal de Primera Instancia (Sala Superior) una petición en la que consigne que desea des-continuar tal empresa común y disponer de los activos utiliza-dos en tal empresa de acuerdo con el plan que ambos accionis-tas acuerden; o que, si no pudiesen ambos accionistas acordar dicho plan, la corporación queda disuelta. La petición deberá acompañarse con una copia del plan de descontinuación y dis-tribución que se propone y una certificación que haga constar que copias de tal petición y plan se han remitido por escrito al otro accionista y a los directores y oficiales de la corporación.
El estatuto no ofrecía una definición de lo que es una empresa común o joint venture. Sin embargo, atendimos ese concepto en Planned Credit of P.R., Inc. v. Page, 103 *69 D.P.R. 245 (1975), antes de que se aprobara la Ley General de Corporaciones de 1995. En ese caso señalamos que se trataba de “una operación limitada a una sola trans-acción”. Id., pág. 251. “No se trata de una asociación con-venida para operaciones diversas y de naturaleza continua, sino una con un fin específico y restringido ...”. (Enfasis suplido.) Id.
El Prof. Carlos Díaz Olivo explica que el propósito del Art. 9.03, supra, es romper el tranque que pudiera existir cuando una empresa común tiene dos accionistas en partes iguales, y evitar así la necesidad del consentimiento uná-nime de los accionistas. C.E. Díaz Olivo, Corporaciones, San Juan, Publicaciones Puertorriqueñas, 2005, pág. 248. Define el término “empresa común” en este contexto como
... la realización de una operación comercial específica llevada a cabo por dos o más personas. Los empresarios para esta operación o actividad aportan dinero, propiedad, conocimien-tos o servicios y comparten entre sí las ganancias y el riesgo de la gestión. La figura de la empresa común guarda gran simi-litud con la sociedad, con la diferencia de que ésta se organiza para operar un negocio de forma continua, mientras que la empresa común lo hace para llevar a cabo una sola transac-ción o gestión comercial. (Enfasis suplido.) Díaz Olivo, op. cit., págs. 248-249.
El Art. 9.03, supra, era homólogo a la Sec. 273 de la Ley General de Corporaciones de Delaware, 8 Del. C. 1953, se-gún enmendada. Esta tampoco define lo que es un joint venture.
La aplicación que ha dado la jurisprudencia de Delaware a esta sección de su Ley General de Corporaciones se ha catalogado como “inconstante”, en parte, por la au-sencia en la ley de una definición de lo que es un joint venture o empresa común. 2-38 Delaware Corporation Law and Practice Sec. 38.04 (2010) [LEXIS].
Los orígenes del joint venture en Estados Unidos se en-cuentran en la jurisprudencia, no en la ley. Los primeros casos que mencionan el concepto gestiones conjuntas de *70 negocios en Estados Unidos datan del siglo XIX. [S.a.], Joint Venture or Partnership, 18 Fordham L. Rev. 114 (1949).
Hourquebie et al. v. Girard, 12 F.Cas. 593, 596 (1808), fue uno de esos casos pioneros. Utilizó el concepto para describir un acuerdo de negocios en que los participantes compartían los riesgos y las pérdidas de una inversión. Es-taba claro que esa gestión de negocios finalizaría en cuanto terminara el asunto para el que se habían unido los inver-sionistas, que no era una operación de carácter continuo. “[H] abía un interés conjunto en una sola gestión, que ter-minaría, y terminó, con la venta de los vinos.” (Traducción nuestra.) Hourquebie et al. v. Girard, supra, pág. 595.
En Delaware, estado cuya legislación corporativa ha co-piado nuestra jurisdicción desde 1956, se comenzó a men-cionar el concepto “joint venture” en Wightman v. San Francisco Bay Toll-Bridge Co., 16 Del. Ch. 200 (1928). Aun-que la opinión de la Corte de Cancillería de Delaware (Court of Chancery of Delaware) —tribunal de primera instancia especializado en casos corporativosno entró a de-finir qué era un joint venture, se refirió a una corporación que se creó específicamente para construir un puente de peaje. Nuevamente se trataba de una gestión de negocios particular, con un fin previsible.
A partir de ese momento continuó el uso del término para diferentes tipos de negocios con un fin específico y término previsible. Por ejemplo, la creación de una corpo-ración cuyo propósito era obtener la concesión de una far-macia durante cinco años, Shore v. Union Drug Co., 18 Del. Ch. 74 (1931); para el desarrollo de bienes raíces, como en Greer v. Moore, 19 Del. Ch. 281 (1933), y Garber v. Whittaker, 6 W.W. Harr. 272, 174 A. 34 (1934). En Greenbaum v. Keil, 30 Del. Ch. 425 (1948), se aplicó el término a una corporación creada para comprar y desarro-llar unos terrenos en particular.
No fue hasta 1950 que el Tribunal Supremo de Delaware definió joint venture o empresa común. En Hanni *71 gan v. Italo Petroleum Corp. of America, 45 Del. 593 (1950), ese foro catalogó el tipo de negocio en controversia como una especie de sociedad, creada para la consecución de una transacción de un solo negocio (single business transaction). El Tribunal Supremo de Delaware extrajo esas características del joint venture del Vol. 48 del Corpus Juris Secundum. Véase Hannigan v. Italo Petroleum Corp. of America, supra, pág. 607.
En Pan Am. Trade & Inv. Corp. v. Commercial Metals Co., 33 Del. Ch. 425 (1953), la Corte de Cancillería amplió la definición. Precisó que joint venture es un tipo de nego-cio en que las partes involucradas combinan su propiedad, dinero, habilidades y conocimiento para generar ganancias. Para llegar a esa definición, la corte se funda-mentó en casos de diferentes jurisdicciones de Estados Unidos, además del Corpus Juris Secundum, American Law Report y American Jurisprudence. Pan Am. Trade & Inv. Corp. v. Commercial Metals Co., supra, págs. 427-428.
Dos años más tarde, el Tribunal Supremo de Delaware validó esa definición. En Consolidated Fisheries Co. v. Consolidated Solubles Co., 35 Del. Ch. 125, 112 A.2d 30 (1955), se recurrió nuevamente a fuentes secundarias de derecho para reiterar que en un joint venture las partes combinan su propiedad, dinero, esfuerzos y habilidades o conocimien-tos para llevar a cabo una transacción de un solo negocio (single business transaction). Ese mismo foro reiteró sus pronunciamientos en J. Leo Johnson, Inc. v. Carmer, 156 A.2d 499 (1959). En ese caso también se descansó en juris-prudencia de diferentes estados.
Además de la definición ya provista en sus precedentes judiciales, el Tribunal Supremo de Delaware acogió en Warren v. Goldinger Bros., Inc., 414 A.2d 507 (1980), cinco elementos por los que generalmente se reconoce un joint venture, para elaborar su definición. Estos elementos son: (1) la existencia de una comunidad de intereses para alcan-zar un propósito común; (2) control conjunto o derecho con- *72 junto; (3) interés propietario conjunto; (4) derecho a com-partir las ganancias, y (5) una responsabilidad de compartir las pérdidas. Id., pág. 509. Al analizar la aplica-ción que la jurisprudencia de Delaware ha hecho de estos elementos, los tratadistas entienden que ha sido “incons-tante” y “problemática”. Delaware Corporation Law and Practice, supra.
La opinión no publicada en In re Arthur Treachers Fish & Chips, 180 Del. Ch. LEXIS 489 (1980), adoptó la defini-ción de joint venture elaborada en los precedentes judicia-les de la jurisdicción. Pero, además, añadió que histórica-mente el uso del concepto no se había limitado a empresas que realizaran una sola transacción, sino que se había apli-cado a negocios que involucraban la adquisición y opera-ción de negocios complejos. Para sustentar tal aseveración, el tribunal citó Consolidated Fisheries Co. v. Consolidated Solubles Co., supra.
Si bien es cierto que en Consolidated Fisheries Co. v. Consolidated Solubles Co., supra, pág. 129, se trataba de la construcción y operación de una planta para procesar los desechos de otra fábrica, el contrato establecía un término de diez años para la empresa. En contraste, In re Arthur Treacher’s Fish & Chip, supra, trataba de una corporación que adquirió y operaba varios restaurantes, sin que se mencionara que el acuerdo entre las partes tuviera una terminación previsible. Al aplicar la figura del joint venture en este contexto, el tribunal determinó que para acti-var el procedimiento de disolución expedita de la See. 273 bastaba hacer una determinación bona fide sobre la inha-bilidad de los accionistas para llegar a acuerdos.
Trece años después, en In re Coffee Associates, Inc., 1993 Del. Ch. LEXIS 263 (1993), otra opinión no publicada, la Corte de Cancillería señaló que la mera intención de las partes en crear una comunidad de intereses no es sufi-ciente para que se constituya una empresa común pues, si *73 fuera así, “cualquier corporación íntima en que los accio-nistas entren en un acuerdo podría ser una empresa común”. (Traducción nuestra.) Id., pág. 15. La cancillería desfavoreció esa interpretación.
Luego de ese razonamiento, la Corte de Cancillería de Delaware retomó el concepto empresa común de In re Arthur Treacher’s Fish & Chips, supra. En Wah Chang Smelting & Ref. Co. of Am. v. Cleveland Tungsten, 1996 Del. Ch. LEXIS 102 (1996), la corte reiteró que las empresas comu-nes no se tenían que limitar a una sola línea de negocios. Aplicó la figura a un acuerdo para construir y operar una planta para manufacturar productos de tungsteno. Sin embargo, el caso tampoco discutió nada acerca de la intención de las partes involucradas en operar el negocio de forma continua o perpetua. La corte aplicó la See. 273 y disolvió la corporación.
Los tratadistas entienden que la determinación de la Corte de Cancillería en Wah Chang Smelting & Ref. Co. of Am. v. Cleveland Tungsten, supra, estuvo influenciada por el Lecho de que en los documentos corporativos uno de los accionistas se refería a la corporación como un joint venture. Aunque la Corte de Cancillería reconoció en In re McKinney-Ringham Corp., 1998 Del. Ch. LEXIS 34 (1998), que para aplicar el concepto no es requisito una designa-ción explícita de que se trata de un joint venture, los trata-distas entienden que la denominación como tal en los do-cumentos de negocios es un factor “controlante” a la hora de su aplicación. Delaware Corporation Law and Practice, supra.
Si bien es cierto que en la jurisprudencia estudiada, la Corte de Cancillería de Delaware llegó a aplicar el con-cepto joint venture a empresas con operaciones aparente-mente continuas, no se consideró esa característica a profundidad. Sin embargo, para los tratadistas esa carac- *74 terística es una de las determinantes a la hora de identifi-car una empresa común.
La definición de empresa común que proveen los trata-distas resulta más armoniosa que la que desglosa la juris-prudencia de Delaware. Fletcher define la empresa común como una asociación de dos o más personas en una sola empresa para generar ganancias. “Los principios legales que gobiernan las sociedades generalmente gobiernan las empresas comunes, porque las empresas comunes son, esencialmente, sociedades para realizar una sola empresa”. (Traducción nuestra.) 1 Fletcher Cyclopedia of the Law of Corporations Sec. 23, págs. 40-41 (2006).
Por su parte, Rowley indicó que la definición más pro-mulgada de una empresa común es aquella en que dos o más personas buscan, conjuntamente, una ganancia de un negocio, sin que haya propiamente una designación de so-ciedad o corporación. 2 Rowley on Partnership Sec. 52.2, pág. 464 (1960). La otra definición más citada, según Rowley, apunta a que es una asociación de dos o más per-sonas para llevar a cabo una empresa de un solo negocio (single business enterprise). Añade que “frecuentemente se dice que una empresa común es un tipo de sociedad limi-tada, no en el sentido legal, sino en su alcance y duración”. (Enfasis y traducción suplidos.) Id., págs. 464 y 465.
La naturaleza de una empresa común es tal que raras veces existe por un período fijo de tiempo. Su objetivo no es realizar un negocio por un determinado número de meses o años, sino concluir de manera exitosa y rentable, una transacción particular o una serie de transacciones. Así, generalmente se sos-tiene que una empresa común continúa hasta que se cumple su propósito o definitivamente se determina que su propósito no puede cumplirse. (Traducción y énfasis suplidos.) Rowley on Partnership, supra, Sec. 52.36, pág. 509.
Este tratadista añade que existe una excepción apa-rente al principio general de la duración limitada de las empresas comunes, que se recoge en un grupo de casos que contienen empresas continuas, que terminan a voluntad de *75 las partes luego de una notificación razonable. Sin embargo, el tratadista entiende que no existe tal excepción, sino que estos casos, sencillamente, no tratan de “joint ventures” o empresas comunes. “Propiamente clasificados y ca-racterizados, estas no constituyen, sin embargo, una excepción. Estos negocios continuos deben considerarse como asociaciones y no como empresas comunes.” (Traduc-ción nuestra.) Rowley on Partnership, supra, Sec. 52.36, pág. 510.
Rowley no está solo en su apreciación sobre la exclusión de negocios perpetuos de la definición de empresa común. Esta postura también la avalan otros tratadistas. Henn y Alexander señalan que la empresa común se diferencia de otros tipos de negocios en que se trata de dos o más perso-nas que se unen para llevar a cabo un negocio particular y se disuelve una vez finaliza ese negocio. Para ellos, una empresa común es un tipo de asociación temporera. H.G. Henn y J.R. Alexander, Laws of Corporations, 3ra ed., St. Paul, West Publishing, 1983, Sec. 49, págs. 105 y 106. Véase, además, H.G. Reuschlein y W.A. Gregory, Agency and Partnership, St. Paul, West Publishing Co., 1979, pág. 442; J.W. Barlett, Venture Capital: Law, Business Strategies and Investment Planning, Nueva York, John Wiley & Sons, 1988, Sec. 3.5, pág. 38.
Como puede observarse, en un esfuerzo por lograr una definición satisfactoria de lo que es una empresa común, se denota una tendencia por compararla con la figura de la sociedad, con la que guarda muchas similitudes. Sin embargo, la figura del joint venture puede ir acompañada de una estructura corporativa. Esta tendencia no es nueva y las características del joint venture no tienen que alterarse por su incorporación. En Delaware se ha visto esta combi-nación de figuras, al menos, desde 1928 en Wightman v. San Francisco Bay Toll-Bridge Co., supra.
Algunos tratadistas reconocen que la coexistencia de ambas figuras es confusa, por las diferencias en el grado de *76 formalidad que conlleva cada una y las consecuencias so-bre la responsabilidad de los socios, quienes pasan a ser accionistas cuando se opta por la incorporación. Incluso, reconocen que el uso del término corporación de empresa común puede resultar confuso, porque se utiliza para em-presas cuya gestión de negocios se puede extender por mu-chos años. 1 O’Neal and Thompson’s Close Corporations and LLCs: Law and Practice, Sec. 1:7 (2004). Véase, además, Henn y Alexander, op. cit., Sec. 50, pág. 108.
Sin embargo, para Fletcher la figura corporativa no ex-cluye necesariamente la empresa común. “Una corporación y una empresa común pueden coexistir como dos entidades legales distintas, y bajo cada una, las partes pueden adqui-rir diferentes derechos y obligaciones.” (Traducción nuestra.) Fletcher Cyclopedia of the Law of Corporations, supra, Vol. 8, Sec. 3997.10, págs. 347—348.
Para Rowley, una vez se incorpora una empresa común, las partes se convierten en accionistas u oficiales de la cor-poración y la relación debe regirse por la ley de corporacio-nes aplicable. Rowley on Partnership, supra, Sec. 52.36, pág. 510.
O’Neal y Thompson añaden que una empresa común es un tipo de corporación íntima. Es decir, es una empresa que tiene pocos accionistas, quienes usualmente no pla-nean vender sus acciones a personas extrañas a la corpo-ración, se consideran a sí mismos como socios en una em-presa de alcance limitado y usualmente interesan desviarse del patrón de administración corporativa tradicional. O’Neal and Thompson’s, supra.
Ante este panorama, podemos resumir que una empresa común es un negocio en el que dos o más personas jurídicas combinan su propiedad, dinero, esfuerzos, habilidades y conocimientos para llevar a cabo una gestión de negocios, cuya complejidad puede acarrear más de una transacción, pero que no tiene la intención de operar de forma continua, sino hasta que culmine la gestión de negocios para la que se unieron.
*77 B
El Capítulo 14 de la Ley General de Corporaciones de 1995 (14 L.P.R.A. sec. 32.01 et seq. (ed. 2008)), sobre la venta de activos y disolución, proveía otro mecanismo para poner fin a las corporaciones regulares. Se trata del Art. 9.05 (14 L.P.R.A. sec. 3005 (ed. 2008)). En ese artículo, la junta de directores de la corporación era el organismo que iniciaba el proceso de disolución con la aprobación de una resolución por parte de la mayoría absoluta de sus integrantes. Los accionistas tenían que aprobar esa deter-minación posteriormente.
La Ley General de Corporaciones de 1995 no contenía una disposición específica que proveyera para la disolución de la corporación a petición de alguno de los accionistas por encontrarse la entidad en una situación de tranque. Díaz Olivo, op. cit., pág. 246.
Pero, aparte de la disolución, la Ley General de Corpo-raciones daba a los tribunales otros poderes para manejar situaciones de tranque entre accionistas de una corpora-ción regular. El Art. 7.16 (14 L.P.R.A. sec. 2916 (ed. 2008)), disponía:

Artículo 7.16 Nombramiento de administrador judicial o sín-dico de una corporación en caso de empate o por otra causa

(a) A petición de cualquier accionista, el Tribunal de Pri-mera Instancia (Sala Superior) podrá nombrar a una o más personas como administrador o administradores judiciales y, si la corporación está insolvente, como síndico o síndicos, de cualquier corporación, cuando:
1. En cualquier reunión de elecciones de directores haya un empate entre los accionistas de manera que no se puedan elegir los sucesores de los directores cuyos términos hayan vencido o vencieran antes de la elección de sus sucesores; o
2. Los asuntos de la corporación estén sufriendo daños irreparables o estén bajo amenaza de sufrir los mismos debido al empate entre los directores en cuanto a la administración de los asuntos de la corporación de que no se pudiera obtener *78 la votación necesaria para actuar de parte de la junta de directores y los accionistas no pueden poner fin al empate, o
3. La corporación haya abandonado sus negocios y no haya tomado las medidas necesarias para disolver, liquidar o distribuir sus activos dentro de un plazo razonable.
(b) Un administrador judicial nombrado al amparo de [este artículo] estará autorizado para continuar con los asuntos de la corporación y no para liquidar los mismos ni para distribuir sus activos, salvo cuando el tribunal ordene otra cosa o en los casos que surjan según el párrafo (3) del inciso (a)(3) de [este artículo], o [el párrafo (2) del inciso (a)(2) del Artículo 14.15 de esta Ley]. (Énfasis suplido.)
Este artículo era idéntico a la See. 226 de la Ley General de Corporaciones de Delaware de 1953, según enmen-dada, 8 Del.C. 1953, See. 226. En Giuricich v. Emtrol Corp., 449 A.2d 232 (1982), el Tribunal Supremo de Delaware ordenó la designación de un administrador al am-paro de la sección equivalente a la 7.16(a)(1), supra. Había un tranque entre los únicos dos accionistas y uno de ellos controlaba la junta de directores. Como cada uno era dueño del 50% de las acciones no podían elegir una nueva junta.
El tribunal resolvió que fue un “abuso de discreción y error” de la Corte de Cancillería negar el nombramiento de un administrador según la Sec. 226(a)(1), supra. Concluyó que no aplicar esa sección era dejar sin remedio ni recurso al accionista que se quedaba sin representación en la junta de manera perpetua por la distribución de las acciones en partes iguales. “Este resultado no fue deseado bajo la Sec. 226(a)(1) y no debe permitirse.” (Traducción nuestra.) Giuricich v. Emtrol Corp., supra, pág. 240.
Así, se ordenó la designación de un administrador judicial imparcial y de probado trasfondo en negocios, cuyas actuaciones vinculaban a los oficiales y directores de la corporación. No podía ser accionista ni acreedor de la corporación. El tribunal le confirió poder para intervenir en decisiones en la junta de directores, llamar a reuniones *79 de la junta de directores o de los accionistas. Giuricich v. Emtrol Corp., supra, pág. 240.
De igual modo, en Miller v. Miller, 2009 Del. Ch. LEXIS 16 (2009), una opinión no publicada, la Corte de Cancille-ría de Delaware asignó un administrador para otra corpo-ración cuya titularidad se dividía, en partes iguales, entre dos hermanos y sus descendientes. No se ponían de acuerdo en cuanto a cuál debía ser el futuro de la corporación.
La Corte de Cancillería enumeró que los poderes del administrador serían resolver los tranques entre los direc-tores, los tranques operacionales, participar como director en caso de que alguno de sus accionistas se quedara sin la debida representación de sus intereses en la junta de directores y resolver el tranque en torno al futuro de la corporación. Miller v. Miller, supra.
Por otro lado, nuestro Art. 7.16(b), supra, señalaba que el administrador designado por el tribunal estaba autori-zado para continuar con los asuntos de la corporación, pero no para liquidarla ni distribuir sus activos. Sin embargo, en ese mismo párrafo se establecía como excepción que el tribunal hubiere dado instrucciones en contrario.
El artículo encontraba su equivalente en la Sec. 226(b) de la Ley General de Corporaciones de Delaware. La Corte de Cancillería de ese estado ha validado la designación de un administrador para liquidar una corporación. En los casos Bentas v. Haseotes, 769 A.2d 70 (2000) y 2003 Del. Ch. LEXIS 24 (2003), la Corte de Cancillería designó un administrador para que resolviera un tranque entre los directores. En el primero de los casos, el 769 A.2d 70, ins-truyó al administrador que explorara todas las alternati-vas que pudieran resultar en una solución al tranque entre los accionistas. En la secuela de ese caso, 2003 Del. Ch. LEXIS 24 (2003), avaló el plan que presentó el administra-dor para subastar los activos, pero se consideraron alter-nativas como dividir la corporación y su venta.
*80 c
El Art. 14.17 de la Ley General de Corporaciones de Puerto Rico de 1995 (14 L.P.R.A. sec. 3217 (ed. 2008)), atendía la disolución de las corporaciones íntimas. Una corporación íntima es una corporación con 35 accionistas o menos, cuyas acciones son de transferencia limitada y no pueden venderse en oferta pública. Art. 14.03 (14 L.P.R.A. see. 3203 (ed. 2008)).
Al amparo de la Ley General de Corporaciones de 1995, el Tribunal de Primera Instancia podía ordenar la disolu-ción de una corporación íntima por un tranque entre los accionistas o directores sobre cómo conducir los negocios de la corporación. Art. 14.17, supra. Sin embargo, antes de recurrirse a la disolución por esta razón, se debía ir pri-mero a los remedios que proveen los Arts. 14.15 y 14.16 (14 L.P.R.A. sees. 3215 y 3216 (ed. 2008)). Es decir, debía haber fracasado la designación de un administrador judicial, un síndico o director provisional.
Así pues, los tribunales deben ser “cautelosos y restric-tivos” al ejercer su poder de disolución de una corporación íntima, porque esa acción representa la eliminación de un negocio y, por consiguiente, de su valor económico. Díaz Olivo, op. cit., pág. 343.
Para que a una corporación le aplique el Capítulo 14 de la Ley General de Corporaciones, supra (corporaciones ín-timas), tenía que hacer constar en su certificado de incor-poración que cumplía con los requisitos y su interés de que se le considerara como corporación íntima. Arts. 14.01 y 14.03 (14 L.P.R.A. secs. 3201 y 3203 (ed. 2008)).
III
Una ley debe interpretarse considerando todas sus par-tes, como conjunto, y no tomando aisladamente sus párra- *81 fos, secciones o incisos. Cirino v. Fuentes Fluviales, 91 D.P.R. 608, 616 (1964); Central Coloso v. Descartes, Tes., 74 D.P.R. 481, 485 (1953). El propósito de este principio fundamental de interpretación estatutaria es, por un lado, aclarar ambigüedades y, por el otro, hacer de la ley un todo armónico y efectivo. Así se procura que haya constancia y que todas las partes del estatuto tengan efecto. R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed., San Juan, Pubs. J.T.S., 1987, pág. 315.
Cuando el legislador incluye unas palabras en un artí-culo de la ley, “[e]sas palabras tienen su significado. Esas palabras revelan una intención manifiesta”. Belaval v. Todd, 24 D.P.R. 26, 39 (1916). Debemos hacer todos los esfuerzos para darle efectividad a todo lo que el legislador expresa en una ley. Las palabras no están en la ley por mero azar o por improvisación, sino que están allí por al-guna razón. Bernier y Cuevas Segarra, op. cit., pág. 316.
La Ley General de Corporaciones no puede ser la excepción. Cada capítulo y cada artículo debe evaluarse en su contexto y en atención a los demás capítulos y artículos. Al mismo tiempo, cada palabra utilizada en la ley debe tener un significado que ayude a interpretar la ley como el todo armónico que es.
El Art. 9.03, supra, establece desde su título que trata sobre la disolución de una corporación de empresa común de dos accionistas. Si el legislador hubiera querido incluir dentro de ese artículo a cualquier corporación de dos accio-nistas, no hubiera especificado que el artículo es aplicable a una "corporación de empresa común”. Como las palabras que utiliza el legislador dentro de una ley están allí por alguna razón, es una conclusión inescapable que quería decir algo más. Tenemos que interpretar a qué se refería cuando especificó que aplica a corporaciones de empresa común.
*82 La Ley General de Corporaciones de 1995, al igual que la Ley de Corporaciones de Delaware que tomó como mo-delo, está huérfana de una definición de lo que es una em-presa común o joint venture. Sin embargo, este Tribunal ya había utilizado el término en Planned Credit of P.R., Inc. v. Page, supra. En esa ocasión, se utilizó el término para re-ferirse a una operación limitada a una sola transacción, no a operaciones diversas ni de naturaleza continua. Id., págs. 250-251.
Esta definición se extrajo de tratadistas como Rowley quien, como vimos, también apunta a que un joint venture tiene una duración y alcance limitados. Rowley on Partnership, supra, Sec. 52.2, págs. 464 y 465. Este interpreta que la vigencia de una empresa común continúa hasta que cumple su propósito o se determina que no puede cumplirse. íd., See. 52.36, pág. 509. Más aún, enfatiza en que aquella jurisprudencia que trata a empresas de opera-ciones continuas como joint ventures es errada, ya que en-tiende que son más bien otras formas de hacer negocios. Para Rowley, el que un negocio sea por tiempo indefinido excluye la posibilidad de un joint venture. Id., Sec. 52.36, pág. 510.
En el aspecto de la no continuidad de la empresa común, la definición de Planned Credit es cónsona con la que ha-bían adoptado la Corte de Cancillería y el Tribunal Supremo de Delaware hasta ese momento. La diferencia en-tre ambas estriba en si una empresa común se limita a una sola transacción o puede dedicarse a más de una. Esa dife-rencia aparente bien pudiera derivarse de las dificultades en la traducción de los conceptos.
La opinión mayoritaria concentra su análisis en que una empresa común se puede dedicar a más de una tran-sacción, a lo que no nos oponemos siempre y cuando las transacciones estén vinculadas a una misma gestión de negocios. Incluso, esa gestión puede tomar muchos años en completarse.
*83 Sin embargo, el análisis de la mayoría no profundiza sobre el aspecto de la intención de continuidad en las ope-raciones de la empresa. La jurisprudencia de Delaware tampoco se ha adentrado a analizar ese aspecto, sobre el que sí se han expresado claramente los tratadistas. Estos descartan las operaciones continuas como parte del con-cepto empresa común.
El hecho de que una corporación de empresa común pueda dedicarse a un negocio que conlleve transacciones complejas, como ha interpretado la jurisprudencia de Delaware y hoy adopta la mayoría, no puede significar que la empresa tenga la intención de realizar el mismo tipo de transacción de forma continua o perpetua. Un joint venture no puede tener la intención de operar por tiempo ilimitado aunque pueda llevar a cabo una gestión de negocio que conlleve años en completarse. Lo contrario la convertiría en corporación regular sin ninguna particularidad adicio-nal, y vaciaría de significado la frase “empresa común” que dispuso el legislador en el Art. 9.03, supra.
De lo contrario, ¿para qué el legislador iba a especificar que el Art. 9.03, supra, aplicaba a las corporaciones de em-presa común, si quería incluir a todas las corporaciones compuestas por dos accionistas con participaciones igua-les? Ese significado ignora la intención manifiesta del legislador.
Por estas razones opino que la definición que debemos dar al término joint venture hoy día no tiene que distan-ciarse de Planned Credit en el aspecto de la no continuidad del negocio. Es una sola gestión de negocios, cuya comple-jidad puede abarcar más de una transacción, mientras es-tén interrelacionadas, pero que no tiene el propósito de ser una operación continua. La empresa tiene que culminar cuando finalice la gestión que se acordó entre las partes.
Somos conscientes de que el Informe de la Comisión de Reforma Gubernamental del Proyecto del Senado 1122, que produjo eventualmente la Ley General de Corporacio- *84 nes de 1995, instruye a que se utilicen los preceptos y las normas que haya desarrollado la jurisprudencia del estado de Delaware alrededor de su Ley General de Corporaciones. Comisión de Reformas Gubernamentales del Senado de Puerto Rico, Informe sobre el P. del S. 1122 de 9 de junio de 1995, pág. 9. El mandato del legislador es que utilicemos el desarrollo de la Ley General de Corpora-ciones de Delaware como guía. Sin embargo, la jurispru-dencia de Delaware no nos ofrece mucha luz para analizar los hechos de este caso, pues no ha analizado el aspecto de la continuidad del negocio. En contraste, nuestra jurispru-dencia sí lo hizo en Planned Credit, caso que sí nos ofrece luz al respecto. No vemos razón para distanciarnos de esa definición.
P.G.D. es una corporación que se dedica a la venta y distribución de productos genéricos. De ninguna parte del expediente surge que sus accionistas tenían la intención de finalizar operaciones con la consecución de algún evento. Sus operaciones consistían en un mismo tipo de transac-ción, de forma continua. Eso la excluye del concepto corpo-ración de empresa común.
La opinión del Tribunal reconoce que el Art. 9.03, supra, no debe aplicar a toda corporación compuesta por dos accionistas. Sin embargo, la interpretación que hace de lo que es una empresa común tiene como resultado lo que quiere evitar. Ello se evidencia en que la mayoría aplicaría esa disposición al caso de Epstein v. F. & F. Mortgage Corp., 106 D.P.R. 211 (1977), que trataba sobre dos corporaciones regulares de operaciones continuas, dedicadas a la indus-tria hipotecaria. En ese caso, este Foro accedió a la disolu-ción según el principio de equidad, pues las diferencias irreconciliables entre los dos únicos accionistas amenaza-ban con llevar las corporaciones al fracaso.
Además, la opinión mayoritaria da a entender que el hecho de que se incluyera el concepto joint venture en el Art. 9.03, supra, equivale a codificar la figura y darle *85 forma corporativa. Entendemos que esa interpretación es equivocada. El concepto joint venture nació mucho antes de que se aprobara la Ley General de Corporaciones de Delaware de 1953. Lo que hizo el estatuto fue integrar a su legislación corporativa el concepto que ya habían desarro-llado los tribunales. Si el legislador hubiera querido alte-rar el significado de empresa común que había elaborado la jurisprudencia, hubiera provisto una definición para ello dentro del mismo estatuto.
Más aún, las empresas comunes existían y seguirán existiendo más allá de la Ley General de Corporaciones. El hecho de que se incluya dentro de la Ley General de Cor-poraciones para atender el caso particular de las empresas comunes que adquieren forma corporativa no excluye que puedan existir joint ventures en otras formas de hacer ne-gocios, como una sociedad, por ejemplo.
La mayoría distingue entre la empresa común y la cor-poración de empresa común, como si ello cambiara la esen-cia del joint venture. La única diferencia que la incorpora-ción produce es dotar al negocio de los beneficios que provee la ley corporativa a sus accionistas, como los límites en la responsabilidad que asumen por sus negocios. Preci-samente, es ese uno de los aspectos principales que discu-ten los tratadistas al analizar la combinación de ambas figuras.
La opinión del Tribunal añade que la Ley General de Corporaciones que existía cuando se resolvió Planned Credit no contemplaba que la empresa común pudiera tener forma corporativa. Sin embargo, el mero hecho de que se considerara aplicar la figura a ese caso es evidencia de que sí era posible, aunque no estuviera expresamente dis-puesto en la ley.
Por último, la opinión mayoritaria entiende que la defi-nición que adoptamos en Planned Credit of P.R. no nos ata porque el caso se resolvió antes de que se aprobara la Ley General de Corporaciones de 1995. Sin embargo, en el as- *86 pecto del tiempo limitado de operación de la empresa co-mún, esa definición es cónsona con la que todavía avalan los tratadistas expertos en la materia.
Una interpretación integrada de la Ley General de Cor-poraciones de 1995 también nos lleva al mismo resultado. Además de que, como mencionamos, interpretar el joint venture como una empresa con operaciones continuas va-ciaría esa frase de significado en el Art. 9.03, supra, debe-mos mirar a los otros artículos de la ley.
El Capítulo 14, supra, permite la disolución de una cor-poración íntima en caso de tranque, pero solo luego de un procedimiento en el que se hagan unos esfuerzos por salvarla. Es decir, la disolución no es la primera alterna-tiva para esos casos.
El Art. 7.16, supra, permite confeccionar un remedio similar al de las corporaciones íntimas en caso de que haya un tranque en una corporación regular, que pertenezca a dos accionistas en partes iguales. Ese artículo faculta al Tribunal de Primera Instancia a designar un administra-dor judicial si algún accionista lo solicita. Ese administra-dor puede, incluso, asumir la función de un síndico y liqui-dar la corporación si el Tribunal de Primera Instancia le confiere ese poder expresamente. Aunque disolver y liqui-dar son conceptos distintos, en este tipo de caso se llegaría a un resultado parecido pues la disolución de la corpora-ción conlleva su liquidación.
Si, luego de descartar la aplicación del Art. 9.03, supra, para empresas comunes, analizamos el procedimiento para disolver una corporación íntima y la alternativa del Art. 7.16, supra, para la corporación regular, vemos que la Ley General de Corporaciones no obliga a dos accionistas en partes iguales a permanecer en un negocio continuo en contra de su voluntad. Para ellos también existen remedios.
Sin embargo, ese remedio no puede ser la disolución ex-pedita como primera alternativa. La ley establece unos me- *87 canismos que intentan resolver el tranque primero y sal-var la corporación. Esta interpretación, entendemos, es más cónsona con el espíritu de la ley. Me parece que el que los tribunales disuelvan de forma expedita corporaciones productivas, que estimulan la economía, no ayuda a “pro-mover la expansión del sector empresarial y agilizar el mo-vimiento de capital en la economía”, propósito expreso de la Ley General de Corporaciones de 1995, según su Expo-sición de Motivos. 1995 (Parte 1) Leyes de Puerto Rico 620.
Visto de esa forma, se hace evidente que el Art. 9.03, supra, para la disolución expedita de empresas comunes, es una excepción. No puede estar disponible para todas las corporaciones de dos accionistas que tienen la intención de operar de forma continua. Es una excepción que se reservó para empresas que, aunque conllevaran una gestión de ne-gocios compleja compuesta de distintas transacciones, te-nían un fin previsible con la llegada de algún evento pre-viamente pactado, que conllevaría la finalización de esa gestión. Un tranque entre los dos accionistas únicos en partes iguales es suficiente justificación para su disolución, pues de todas formas, la corporación tenía un fin previsible.
Sin embargo, para las corporaciones que tienen la inten-ción de conllevar operaciones continuas se buscaron otras alternativas que procuraran por su supervivencia y la per-manencia de su valor en la economía. Por ello, es que en-tiendo que la interpretación que hoy se le da al Art. 9.03, supra, trastoca el esquema de disolución de corporaciones que el legislador ordenó en la ley. Flexibiliza la disolución de corporaciones de operaciones continuas por parte de los tribunales, sin que se hagan mayores esfuerzos por subsa-nar los tranques entre los dos accionistas en partes iguales.
En el Art. 9.05, supra, hay un procedimiento para la disolución de las corporaciones regulares sin que inter-venga un administrador o director designado por el *88 tribunal. Sin embargo, aplica cuando media el consenti-miento mayoritario de la junta de directores y de la mayo-ría de los accionistas, es decir, cuando la mayor parte de la estructura de poder de la corporación ya no interesa que esta continúe con vida. No aplica cuando los propietarios de la corporación están divididos en partes iguales en torno a la decisión de si debe disolverse o no. Permitir esto en el caso de dos accionistas propietarios en partes iguales, me-diante la aplicación del Art. 9.03, supra, sería privilegiar-los sobre los demás casos de tranques entre accionistas, quienes tendrían que recurrir a otros remedios de la ley por el mero hecho de que son más de dos.
De todos modos, como la corporación pertenece a dos accionistas en partes iguales, no podemos aplicar el Art. 9.05, supra, pues ante el tranque, nunca se alcanzaría la mayoría necesaria para la disolución que solicitó el señor Lloréns. Tampoco podemos aplicar los procedimientos de disolución para corporaciones íntimas porque P.G.D. está registrada como una corporación regular.
Sin embargo, las partes no están huérfanas de remedio en la ley. Recordemos que la Regla 42.4 de Procedimiento Civil, 32 L.P.R.A. Ap. V, establece que “[t]oda sentencia concederá el remedio a que tenga derecho la parte a cuyo favor se dicte, aun cuando ésta no haya solicitado tal reme-dio en sus alegaciones”.
Así, en este caso es aplicable el Art. 7.16, supra, que permite al Tribunal de Primera Instancia confeccionar un remedio similar al de la disolución de las corporaciones íntimas de operaciones continuas. Es evidente que existe un tranque entre los accionistas sobre cuál debe ser el fu-turo de la corporación y actualmente uno de los dos accio-nistas no cuenta con la representación adecuada en la junta de directores. Incluso, el señor Lloréns alega que el señor Arribas se ha negado durante años a convocar re-uniones de accionistas para elegir una nueva junta de directores.
*89 Según el Art. 7.16, supra, si un accionista lo solicita, el Tribunal de Primera Instancia puede asignar un adminis-trador judicial para que, entre otras cosas, intente resolver los tranques, convocar a una reunión de accionistas, me-diar para que uno compre al otro su parte, y, de entenderse necesario, hasta puede liquidarse la corporación, previa autorización del tribunal, si fuere necesario.
Sin embargo, el Tribunal de Primera Instancia no está obligado a otorgar al administrador la capacidad para li-quidar la corporación, si decide nombrarlo. Las facultades del administrador deben enumerase expresamente y deben confeccionarse en atención al caso particular de la corpora-ción para la que se solicite. Después de todo, la interven-ción de los tribunales en este proceso debe ser tan mínima como sea posible y ejercerse en el grado en que requiera alcanzar la meta de hacer justicia. Giuricich v. Emtrol Corp., supra, pág. 240.
>
Por las razones expuestas, disiento respetuosamente. Revocaría la sentencia del Tribunal de Apelaciones y devol-vería el caso al Tribunal de Primera Instancia para que acoja la petición de disolución al amparo del Art. 9.03 de la Ley General de Corporaciones de 1995, supra, como una solicitud para la asignación de un administrador judicial al amparo del Art. 7.16 de ese mismo estatuto, supra.
Conforme a ello, ordenaría que el tribunal haga una evaluación de los hechos y determine si el caso amerita la designación de un administrador judicial. De así enten-derlo, el tribunal debería enumerar las responsabilidades que tendría el administrador, de acuerdo a las particulari-dades de este caso.

 El Art. 9.03 de la Ley General de Corporaciones vigente, Ley 164-2009, es muy similar a su predecesor:

“Sec. 3703. Disolución de una corporación de empresa común de dos accionistas

“(a) Excepto que el certificado de incorporación o un acuerdo escrito entre los accionistas disponga otra cosa, si los accionistas de una corporación organizada con arreglo a las leyes del Estado Libre Asociado, que tenga sólo dos (2) accionistas, cada uno de los cuales posea el cincuenta por ciento (50%) de las acciones de la misma, se dedicasen al logro de una empresa común (/oireí venture), y si tales accionistas no pudiesen llegar a un acuerdo en torno a la deseabilidad de descontinuar tal empresa común y para disponer de los activos utilizados en dicha empresa, cualquiera de dichos accionistas podrá radicar en el Tribunal de Primera Instancia (Sala Superior) una petición en la que consigne que desea descontinuar tal empresa común y dispo-ner de los activos utilizados en tal empresa de acuerdo con el plan que ambos accio-nistas acuerden; o que, si no pudiesen ambos accionistas acordar dicho plan, la cor-poración queda disuelta. La petición deberá acompañarse con una copia del plan de descontinuación y distribución que se propone y una certificación que haga constar que copias de tal petición y plan se han remitido por escrito al otro accionista y a los directores y oficiales de la corporación. ...” 14 L.P.R.A. sec. 3703.